**The PEOPLE of the State of Colorado,**
**Plaintiff/Appellant,**

v.

**Angela KAISER, Defendant/Appellee.**

No. 01SA58.

Supreme Court of Colorado,
En Banc.

Oct. 15, 2001.

David J. Thomas, District Attorney, First
Judicial District, Donna Skinner Reed, Chief

Appellate Deputy District Attorney, Golden, CO, Attorney for Plaintiff/Appellant.

Cynthia Sheehan, Denver, CO, Attorney for Defendant–Appellee.

Justice RICE delivered the Opinion of the Court.

In this interlocutory appeal pursuant to section 16–12–102(2), 6 C.R.S. (2000),[1] the People seek reversal of the trial court's suppression of statements made by Defendant to police during two interviews on February 4, 2000 and one interview on February 5, 2000. With respect to the first and second interviews on February 4, 2000, the trial court ruled that although Defendant voluntarily waived her rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), she did not do so knowingly and intelligently. In addition, the trial court found that although the February 5, 2001 interview was otherwise lawful, it had been tainted by the unlawful interviews of February 4. Accordingly, the trial court suppressed all statements made by Defendant to police during these interviews.

The record does not support the trial court's finding that Defendant's waiver of her *Miranda* rights was not knowing and intelligent. Instead, we find that the record demonstrates that Defendant understood both the nature of her rights and the consequences of her waiver. Because we find that the questioning during the first and second interviews was lawful, we also hold that the third interview on February 5 was not tainted by a prior illegality. We therefore reverse the suppression order and remand the case for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY

Defendant was charged with sexual exploitation of a child, § 18–6–403(3)(b), 6 C.R.S. (2000), sexual assault on a child, § 18–3–405(1), 6 C.R.S. (2000), and second degree sexual assault, § 18–3–403(1) 6 C.R.S. (2000).

These charges arose out of a police search involving a co-defendant of Defendant, Timothy Stead, on February 4, 2000. During this search, police uncovered photographs depicting Defendant having sexual relations with a teenage boy. Later that day, three police officers visited Defendant's home to speak with her about the pictures. The officers were aware that Defendant is considered developmentally delayed. When Defendant answered the door, police officer Walt Parsons identified himself and the other officers, and Defendant invited them into her apartment. After Officer Parsons informed Defendant that he wished to talk to her about Timothy Stead, Defendant admitted to being in Stead's apartment; however, she denied observing Stead engage in sexual relations with children in his apartment. Officer Parsons showed Defendant the photographs found at Stead's apartment and orally advised Defendant of her *Miranda* rights. Parsons testified that he explained to Defendant that the "right to remain silent" means Defendant "didn't have to say anything." Defendant told the officers that she understood her rights, admitted that she was the person in the pictures, said she had witnessed Stead give underage boys alcohol and drugs for the photographs that were taken, and made other incriminating statements.

After the interview, Defendant was taken to a police station to be fingerprinted and photographed. While at the station, Officer Marcie Vermilye questioned Defendant a second time. Officer Vermilye gave Defendant a second *Miranda* advisement, which she read from a form. Defendant initialed each specific *Miranda* warning on the form. During this interview, Defendant again confessed. After being detained at the police station for about an hour, Defendant was driven home. On February 5, police uncovered photographs depicting Defendant having sexual relations with a second teenage boy. In order to follow up on this new information, Officer Vermilye visited Defendant's home. During the course of this third interview,

---

1. Section 16–12–102(2) provides that, "The prosecution may file an interlocutory appeal in the supreme court from a ruling of the trial court granting a motion made in advance of trial by the defendant … to suppress evidence … if the prosecution certifies to the judge who granted such motion and to the supreme court that the appeal is not taken for the purposes of delay and the evidence is a substantial part of the proof of the charge pending against the defendant."

Officer Vermilye did not read Defendant her *Miranda* rights. Again, Defendant made incriminating statements.

At trial, Defendant pleaded not guilty and filed a motion to suppress the statements she had made to police during the interviews on February 4 and February 5. At the suppression hearing, the state presented testimony from the police officers involved in the questioning of Defendant. Defendant presented expert testimony from a licensed psychologist regarding Defendant's mental condition. The expert testified that because of Defendant's mild mental retardation,[2] Defendant struggles with abstract concepts and tends to be acquiescent to authority figures. She also testified that Defendant has sufficient cognitive skills and abilities to live on her own, although at a marginal level, to make some daily living decisions for herself, and to lie or cover up wrongdoing. After a suppression hearing, the trial court issued a written order granting Defendant's motion, holding that Defendant's statements on February 4 were not knowing and intelligent and that the February 5 statements were tainted by this previous illegality. This appeal followed.

## II. ANALYSIS

### A. STANDARD OF REVIEW

A trial court engages in both fact-finding and law application when it rules on a motion to suppress a confession or inculpatory statement. *People v. Gennings*, 808 P.2d 839, 844 (Colo.1991) (citing *People v. Quezada*, 731 P.2d 730, 732 (Colo.1987)). In reviewing suppression appeals, we grant deference to a trial court's findings of historical fact that are supported by competent evidence in the record. *People v. Pitts*, 13 P.3d 1218, 1221 (Colo.2000); *People v. Quezada*, 731 P.2d 730, 732 (Colo.1987) (trial court's findings of fact will not be overturned if

supported by competent evidence in the record). Where, however, findings of fact are clearly erroneous or not supported by the record, we set them aside. *People v. Mendoza–Balderama*, 981 P.2d 150, 158 (Colo.1999); *People v. Gennings*, 808 P.2d 839, 844 (Colo. 1991) (reversing a suppression order after ruling that the trial court's findings were not supported by competent evidence in the record). Thus, both a trial court's application of an erroneous legal standard in resolving a suppression motion and a trial court's ultimate legal conclusion of constitutional law that is inconsistent with or unsupported by evidentiary findings is subject to correction on review. *Id.*

We conclude that the trial court's ruling is not supported by the record and that Defendant's understanding of her rights and the consequences of relinquishing those rights was sufficient to make her waiver knowing and intelligent.

### B. WAIVER OF *MIRANDA* RIGHTS

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court formulated procedural safeguards to protect the rights of the accused, including the privilege against self-incrimination under the Fifth Amendment. In *Miranda*, the Supreme Court held that where a person is subjected to police interrogation while in custody,[3] the police must make an advisement regarding the accused's rights prior to questioning.[4] *Id.* at 467, 478–79, 86 S.Ct. 1602. If police fail to make this advisement prior to questioning, the court must exclude the defendant's statements from evidence in the prosecution's case. *Id.; Oregon v. Elstad*, 470 U.S. 298, 307, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

2. Defendant scored, overall, a full scale IQ of 69 on the Wechsler III Adult Intelligence Scale. She scored a verbal IQ of 76.

3. Here, the state does not dispute that Defendant was in the custody of the police during the first and second interviews on February 4. The trial court found that Defendant was not in custody during the third interview at Defendant's home on February 5.

4. The defendant must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. *Miranda*, 384 U.S. at 479, 86 S.Ct. 1602.

Once a person has been properly and timely informed of his *Miranda* rights, however, he may choose to waive them and make a statement to police. *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. The validity of a defendant's waiver involves a two-part inquiry. *Colorado v. Spring,* 479 U.S. 564, 573, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987). The waiver must have been made: (1) voluntarily, "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception;" and (2) the waiver must have been made knowingly and intelligently. *Id.* In this case, the issue of the voluntariness of Defendant's waiver is not before us.[5] The only issue on appeal is whether the trial court erred in concluding that Defendant's waiver was invalid because it was not knowingly and intelligently made.

We have previously held that it is the prosecution's burden to prove by a preponderance of the evidence that the defendant's waiver was knowing and intelligent. *People v. Jiminez,* 863 P.2d 981, 984 (Colo.1993)(citing *Colorado v. Connelly,* 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)). This determination, moreover, requires a finding that the person was "fully aware of the nature of the right to remain silent . . . and the consequences of abandoning that right." *Jiminez,* 863 P.2d at 984; *accord People v. May,* 859 P.2d 879, 883 (Colo.1993).

The trial court must consider the waiver based on the totality of the circumstances surrounding the custodial interrogation. *Jiminez,* 863 P.2d at 984; *May,* 859 P.2d at 883; *People v. Hopkins,* 774 P.2d 849, 852 (Colo.1989) (citing *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) and *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)); (*People v. Pierson,* 670 P.2d 770, 775 (Colo. 1983)). We have previously held that simply because the defendant's decision to talk to the police might be ill-advised does not mean that the defendant's decision was not knowing and intelligent. *People v. Jordan,* 891 P.2d 1010, 1016 (Colo.1995). The police are not required to tell the defendant that it might be against his self-interest to confess to the police. *Id.*

In analyzing the totality of the circumstances, factors to consider include, but are not limited to: the time interval between the initial *Miranda* advisement and any subsequent interrogation; whether the defendant or the interrogating officer initiated the interview; whether 'and to what extent the interrogating officer reminded the defendant of his rights prior to the interrogation by asking him if he recalled his rights, understood them, or wanted an attorney; the clarity and form of the defendant's acknowledgement and waiver, if any; and the background and experience of the defendant in connection with the criminal justice system. *People v. Owens,* 969 P.2d 704, 707 (Colo. 1999); *People v. Hopkins,* 774 P.2d 849, 852 (Colo.1989). In addition, the trial court should consider any language barriers encountered by a defendant, *People v. Mejia–Mendoza,* 965 P.2d 777, 781 (Colo.1998); *May,* 859 P.2d at 882; *Jiminez,* 863 P.2d at 986, and the defendant's age, experience, education, background, and intelligence. *Fare v. Michael C.,* 442 U.S. at 725, 99 S.Ct. 2560.

In summary, in examining whether a defendant's waiver was knowing and intelligent, the trial court should consider the totality of the circumstances to determine if the prosecution met its burden of showing that the defendant understood both the nature of his *Miranda* rights and the consequences of abandoning them.

## C. DEFENDANT KNOWINGLY AND INTELLIGENTLY WAIVED HER *MIRANDA* RIGHTS

The trial court's holding that Defendant's waiver was not knowing and intelligent is not supported by the record. Our review of the totality of the circumstances convinces us that Defendant understood her *Miranda* rights and the consequences of relinquishing those rights.

---

5. The trial court found that Defendant's waiver of her *Miranda* rights was voluntary. Although Defendant does not concede that her waiver was voluntary, the trial court's ruling with respect to the voluntariness of the statement is not before us.

First, although the interrogating officers initiated the interviews, the record shows that the officers, after clearly advising Defendant of her *Miranda* rights,[6] reminded Defendant of her rights prior to the interrogation by asking her if she understood her rights. *See Jordan,* 891 P.2d at 1015 (examining the completeness of a *Miranda* advisement in determining that Defendant's waiver was knowing and intelligent). Thus, the record does not support the trial court's finding that "[l]ittle if any effort was made by the police officers to paraphrase the standard *Miranda* advisement in terms less abstract and more easily comprehensible to the defendant or to take any other steps to be assured that Defendant not only comprehended her rights but understood the significance of waiving her rights."[7] (R. at v. I, p. 114.)

The record indicates that during the initial interview on February 4, Officer Parsons, while orally advising Defendant of her *Miranda* rights, explained to Defendant that the right to remain silent means "that she didn't have to say anything," told Defendant "that she had a right to stop answering questions," paused after stating each of the *Miranda* rights, and asked her if she understood her rights. Defendant indicated her understanding. (R. at v. III, p. 20, 30.) Furthermore, Officer Parsons, who knew that Defendant is developmentally delayed and who has experience in modifying questions to the age and developmental level of the interviewee,[8] tailored the advisement in order to make it more clear:

> I tried not to just recite the *Miranda* [advisement] but I tried to explain it to her, the various points. I tried to ask my questions in short sentences that were reasonably understood. I tried not to use confusing words. I tried to be very succinct in what I was asking, very clear in what I was asking.

(R. at vol. III, p. 33–34.) The record also shows that during the second interview on February 4 at the police station Officer Vermilye,[9] using a written copy of the *Miranda* warnings to inform Defendant of her rights, read each right to Defendant individually and asked Defendant to place a mark by each line to indicate that Defendant understood her rights. In addition, Defendant initialed each specific warning. Vermilye explained to Defendant that "by initialing each of the lines that indicates that you understand what it is that we discussed. You understand all of the information in each of the statements." Defendant also signed the form, acknowledging that she wished to speak with the police. Therefore, like the defendant in *Jordan,* Defendant was thoroughly advised of her *Miranda* rights and signed a written waiver.

█ Second, the record illustrates that the clarity and form of defendant's acknowl-

---

6. The record indicates that the time interval between the *Miranda* advisement and the questioning was nominal. It appears Officer Parsons and Officer Vermilye began interviewing Defendant immediately after advising her of her *Miranda* rights.

7. In addition, many of the trial court's own findings of fact belie this conclusion. For example, the trial court, in its findings of fact, noted that: the detective paused after giving each portion of the advisement and explained the rights in greater detail, including the fact that Defendant did not have to answer questions, ¶ 34; at the conclusion of the advisement, the detective asked Defendant if she understood what he had explained to her, ¶ 35; Detective Parsons has had training and experience interviewing children, ¶ 37; Detective Parsons will customarily tailor questions to the age and developmental level of the suspect, ¶ 38; Detective Parsons testified that he tries to explain *Miranda* using short, clear sentences, rather than simply reciting it, ¶ 39; and Detective Parsons knew that Defendant was

developmentally delayed and believed he was communicating very well with Defendant, ¶ 31 and 41. (R. at v. I, p. 98–99.) Moreover, the trial court does not make any findings that it found the detectives not credible.

8. Officer Parsons's background specifically includes training and experience in interviewing children. He has interviewed over a thousand children, about one-third of whom were teenagers. Parsons indicated that he will customarily tailor questions to the age and developmental level of the person with whom he is talking. Moreover, he is aware that children and developmentally disabled adults often want to please authority figures, and understands children can be easily led.

9. Officer Vermilye's background also includes training in interviewing techniques, including the differences between interviewing children and adults. She understood Defendant is at least slow and learning disabled.

edgment and waiver were satisfactory. Thus, contrary to the trial court's finding that "[t]he fact that Defendant appeared responsive to questions and cooperated with the police does not, standing alone, rebut the testimony of [the expert]," (R. at v. I, p. 114), the record shows Defendant understood the *Miranda* advisement. Not only did Defendant tell Officer Parsons that she understood the advisement, *see Jordan*, 891 P.2d at 1015–16 (finding that the defendant's acknowledgment that she understood her rights indicated that she did understand them),[10] but the record also demonstrates that she did in fact understand her rights. In *Jordan*, we relied in part on the defendant's own statements, both during the police interview and at trial, to support our holding that the defendant's waiver was knowing and intelligent. 891 P.2d at 1016. We found that the defendant's statements showed that he understood his rights and was capable of abstract reasoning. Similarly, in this case, although the district attorney failed to present evidence to indicate whether Defendant had previous experience with the criminal justice system, a factor relevant to the totality of the circumstances analysis, Defendant's answers to the police officers' questions were both cogent and responsive.[11] Moreover, as previously indicated, Defendant expressly waived, orally, and prior to the second interview, in writing, her *Miranda* rights. A defendant's express written and oral waiver is "usually strong proof" that the waiver is valid. *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).

Third, in considering the Defendant's age, experience, education, background, and intelligence the record indicates that Defendant is a mildly retarded mother of a two-year-old who not only cared for her daughter until April 2000, but has the cognitive ability to live on her own and make daily living decisions. In analyzing the totality of the circumstances, the defendant's mental capacity is certainly relevant in determining whether the defendant is capable of making a knowing and intelligent waiver; however, it is not determinative. The trial court ruled that "*Miranda* is the law and must be read logically. Some defendants are very intelligent and aware of all of their rights. Others are so lacking in basic intelligence that they cannot possibly waive their constitutional rights without additional precautionary instructions.... [T]his is such a case." (R. at v. I, p. 115.) The court's analysis is flawed. A defendant's mental capacity is important in determining whether she made a knowing and intelligent waiver, however it should not be the only, or even the primary, factor in a trial court's analysis. For instance, courts in other jurisdictions have found waivers by mentally retarded or low-intelligence defendants to be valid. *See, e.g., Derrick v. Peterson*, 924 F.2d 813, 817, 824 (9th Cir.1990) (analyzing several factors and finding valid waiver by petitioner with I.Q. of 74 on the Wexler Adult Intelligence Scale); *Moore v. Dugger*, 856 F.2d 129, 135 (11th Cir.1988) (ruling that notwithstanding petitioner's mental limitations his waiver was intelligent); *Dunkins v. Thigpen*, 854 F.2d 394, 400 (11th Cir.1988) (finding that despite petitioner's allegedly below normal IQ he knowingly

---

**10.** The issue and facts presented in *Jordan* mirror this case. In *Jordan* we reviewed a case in which the trial court found that "the defendant's waiver was not knowing and intelligent because the defendant had 'demonstrated an inability ... to appreciate and ... assimilate the consequences of making a confession and ... the ramifications of [that] statement.'" 891 P.2d at 1014. Also in *Jordan*, like the present case, "a psychiatrist testified on behalf of the defendant, asserting that because of the defendant's below average intelligence and other factors, he could not understand his *Miranda* rights, nor the consequences of abandoning them." *Id.* at 1013–14. We held that the defendant's waiver was knowing and intelligent. *Id.* at 1017.

**11.** For instance, Officer Parsons testified:

Q. Detective [Parsons], when you were speaking to Ms. Kaiser, did she appear to understand that you were police officers?
A. Yes, she did.
Q. Did she appear to understand the advisements that you just explained to us?
A. Yes, she did.
Q. Did she ask you any questions about them?
A. No.
Q. When you explained to her that it was her option to talk to you or not, what was her response?
A. When I asked her if she understood what I explained to her, she said that she did.
(R. at vol. III, p. 20–21.)

waived his *Miranda* rights); *United States v. Glover*, 596 F.2d 857, 866 (9th Cir.1979) (noting, among other factors, that agents who questioned appellant testified that he appeared to understand his rights and respond appropriately, and holding that despite appellant's mental deficiencies waiver was knowing and intelligent); *United States v. Young*, 355 F.Supp. 103, 111 (E.D.Pa.1973) (holding that notwithstanding the government's failure to give the "simple and direct explanation that ... would be necessary in dealing with a person of petitioner's intelligence level," defendant knowingly and intelligently waived his *Miranda* rights) (quoting *United States ex rel. Lynch v. Fay*, 184 F.Supp. 277, 281 (S.D.N.Y.1960)); *Sanford v. State*, 331 Ark. 334, 962 S.W.2d 335, 347 (1998) (analyzing the totality of the circumstances and finding knowing and intelligent waiver by petitioner with full-scale IQ of 67); *State v. Northrop*, 213 Conn. 405, 568 A.2d 439, 446 (1990) (ruling that "[e]ven some degree of mental retardation does not by itself prevent a defendant from knowingly and intelligently waiving his *Miranda* rights" and, after considering several factors, finding a knowing and intelligent waiver); *In re W.C.*, 167 Ill.2d 307, 212 Ill.Dec. 563, 657 N.E.2d 908, 920, 922–23 (1995) (finding knowing and intelligent waiver by petitioner with at least mild retardation); *State v. Knights*, 482 A.2d 436, 442 (Me.1984) (finding rational support for the trial court's finding of a knowing and intelligent waiver by a defendant with a mental defect); *Wold v. State*, 430 N.W.2d 171, 177 (Minn.1988) (holding that petitioner who had been "intellectually 'slow' all his life and had always had difficulty understanding matters of a complex nature" made a knowing and intelligent waiver). *But see, e.g., United States v. Garibay*, 143 F.3d 534, 538–39 (9th Cir.1998) (holding waiver was not knowing and intelligent where advisements made in English to defendant with limited English skills, defendant had no prior experience with the criminal process, and was borderline retarded); *Cooper v. Griffin*, 455 F.2d 1142, 1144–45 (5th Cir.1972) (holding that in light of defendants' mental retardation, poor reading comprehension, and lack of experience with the criminal process, confessions obtained after defendants orally waived right to counsel and signed written waiver forms were invalid).

Moreover, we have previously ruled that diminished mental capacity does not automatically make the defendant's waiver unknowing and unintelligent. In *Jordan*, like the present case, the defendant presented expert testimony that he "had difficulty with abstract concepts, and did not understand his *Miranda* rights." *Jordan*, 891 P.2d at 1016. However, in *Jordan* we ruled that the expert's testimony was refuted on cross-examination and that the defendant's ability to reason in an abstract way was shown by the record. For example, in *Jordan* we emphasized that "the defendant had the foresight to lie to Detective Dailey about his involvement in the murder, when he knew at the beginning of the interview that the detective intended to ask him about his involvement with 'first degree murder'"; that the defendant "fabricated a story" to tell police; and that only when confronted with information from the defendant's roommate did he say, "I'll tell you the whole story, the truth now." 891 P.2d at 1016. Like the defendant in *Jordan*, Defendant's adequate mental capacity is evidenced by her attempt to mislead the police in hopes of avoiding prosecution. During the first interview on February 4, Defendant initially deceived Officer Parsons by denying that she had observed Timothy Stead sexually abuse children, and only later, after Officer Parsons showed Defendant the photographs, acknowledged that she had seen Stead give underage boys alcohol and drugs in exchange for the photographs that were taken. Once the first incident of sexual abuse was uncovered, moreover, Defendant chose not to inform police that there had been another incident of sexual abuse involving a second teenage boy. Finally, Defendant told Officer Vermilye that she had gone to Stead's apartment to retrieve the incriminating pictures. (R. at vol. IV, p. 28–29.)

Furthermore, the record shows that Defendant, though mildly retarded, was intelligent enough to appreciate the seriousness of her predicament and the consequences of talking to the police about this matter. For instance, during the third interview on February 5, Defendant admitted to Officer

Vermilye that she had talked to one of the boys with whom she had sexual relations and had expressed her concerns to him that she would get in trouble if anyone were to find out about the incident. (R. at vol. IV, p. 34.) In addition, Defendant told Officer Vermilye that she understood one of the victims to be eighteen years old, but became suspicious of his age when he could not purchase cigarettes at a nearby store. (R. at vol. IV, p. 32.) Notably, Defendant also expressed remorse to Officer Vermilye about having had sexual relations with the teenage boys. (R. at vol. IV, p. 28.) Finally, the record shows that Defendant understood that she might be sentenced to a prison term if convicted: Officer Vermilye testified that during the third interview, "After [Defendant] acknowledged that relationship and sexual intercourse and contact with [the victim], her immediate response was, am I going to prison?"[12] (R. at vol. IV, p. 33.)

Finally, the record indicates that no language barriers were present in this case. Therefore, it is distinguishable from *People v. May*, 859 P.2d 879 (Colo.1993), *People v. Jiminez*, 863 P.2d 981 (Colo.1993), and *People v. Mejia–Mendoza*, 965 P.2d 777 (Colo. 1998). In those cases, we found that the record supported the trial court's finding that the defendants did not knowingly and intelligently waive their rights under *Miranda*.

In *People v. May*, we held that the defendant's waiver was not knowing and intelligent where the defendant was interviewed after being airlifted to a hospital for treatment of injuries he suffered in a serious automobile accident. 859 P.2d at 883. Indeed, in *May*, the defendant had been drifting in and out of consciousness during the interview and his answers reflected that he was disoriented—he did not know what day it was, where he was, where the accident had

taken place, or whether anyone had been with him in the car. *Id.* at 881–83.

Similarly, in *People v. Jiminez*, we held that a defendant's waiver was not knowing and intelligent where he was given his *Miranda* advisement in a language that was foreign to him. 863 P.2d at 982. More specifically, in *Jiminez*, the defendant was a Native American, whose native language was Kickapoo. The police, who did not have a translator who spoke Kickapoo available, read the defendant his rights in Spanish and went forward with questioning him. *Id.* at 982, 985. In *Jiminez*, we also noted that the defendant's native language did not encompass a word for the concept of "right," that the defendant functioned at the six-year-old level, and that the defendant lacked a formal education. *Id.* at 982, 985.

Finally, in *Mejia–Mendoza*, we held that a defendant's waiver was not knowing and intelligent where an interpreter translating the *Miranda* warnings into Spanish provided misleading and confusing statements to the defendant regarding his rights. 965 P.2d at 781. Specifically, the interpreter told defendant that "nothing is being used against you" and "just because you say something you'll be released." *Id. May*, *Jiminez*, and *Mejia–Mendoza* are distinguishable from this case. Most notably, the communication impediments present in those cases are not present in this case. Here, Defendant was fully conscious at the time she waived her rights, and no language barrier existed to make accurate translation necessary.

Accordingly, after reviewing the totality of the circumstances, we find that Defendant's waiver was knowing and intelligent. The record amply demonstrates that Defendant understood both the nature of her rights and the consequences of waiving them.

---

**12.** Moreover, the trial court likens this case to the situation in which a juvenile is questioned, implying that intelligence is determinative of a defendant's ability to waive his *Miranda* rights. The court cites section 19–2–511, 6 C.R.S. (2001), which disallows a juvenile to waive his rights without the aid of a guardian. Through this comparison, the court suggests that, like the statute mandates for juveniles, a mentally handicapped adult cannot waive his rights on his own.

Yet, this additional safeguard for juveniles is statutorily based, not constitutionally so. Indeed, the Supreme Court in *Fare v. Michael C.*, 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), made clear that a juvenile can knowingly and intelligently waive his *Miranda* rights. In *Fare*, the court employed the same totality of the circumstances test as is used to determine whether any defendant effectively waived his rights. 442 U.S. at 725, 99 S.Ct. 2560.

## III. CONCLUSION

In summary, we hold that the trial court erred in finding that statements made by Defendant during the first two interviews on February 4, 2000 were not knowing and intelligent. Because we find that Defendant's statements on February 4 were obtained lawfully, we also hold that Defendant's statements made to police on February 5 were not tainted by the previous confessions. Therefore, we reverse the ruling of the trial court and remand the case for further proceedings.

Justice MARTINEZ dissenting in part and concurring as to the judgment only.

Justice HOBBS and Justice BENDER join in the dissent and concurrence.

Justice MARTINEZ dissenting in part and concurring, as to judgment only, in part:

In this case, the majority rests its decision to reverse the trial court's suppression order on its determination that "[t]he record does not support the trial court's finding that Defendant's waiver of her *Miranda* rights was not knowing and intelligent." Maj. op. at 482. I disagree. My review leads me to conclude that the trial court's findings of fact are supported by the record, and therefore, the trial court's conclusion to suppress the defendant's February 4 statements is correct. I would thus affirm the trial court's suppression of the defendant's February 4 statements.

The majority rejects the trial court's findings of fact, substitutes its own findings of fact, and concludes that the defendant knowingly and intelligently waived her *Miranda* rights. The majority refers to several facts from the record to support its assertion that, pursuant to the totality of the circumstances standard, the defendant knowingly and intelligently waived her *Miranda* rights. Each of these assertions, standing alone, is arguably supported by the record. However, the majority's findings of fact can be rebutted or disputed by other portions of the record. Further, the conclusion reached by the majority is not supported by the trial court's findings of fact. Because the findings of fact are pertinent to the ultimate conclusion of law, my deference to the trial court's findings

of fact results in my agreement with the trial court's conclusion of law regarding the defendant's February 4 statements.

The majority states that the record does not support the trial court's finding that the police officers made little effort to make the *Miranda* advisement understandable to the defendant. In support of this contention, the majority finds that "the record shows that the officers, after advising the defendant of her *Miranda* rights, reminded the defendant of her rights prior to the interrogation by asking her if she understood her rights." *Id.* at 485. The majority finds from the record that during the initial interview, Detective Parsons explained that the right to remain silent means that "she didn't have to say anything," *id.* at 485, and tailored his *Miranda* advisement because he knew that the defendant was developmentally delayed. *Id.* at 485. These are not findings made by the trial court, although they are supported by the record. In contrast, the trial court found that Detective Parsons did not stop after each point in the *Miranda* warning to make sure that the defendant understood him. *See People v. Kaiser,* No. 00CR498, slip op. at 4 (Jefferson County Dist. Ct. Feb. 7, 2001); *see also* R. vol. III p. 36. This finding is supported by the record and it, in turn, supports the trial court's finding that the police officers made insufficient efforts to assure that the defendant understood the *Miranda* warnings.

The majority also cites Detective Parsons's background and his testimony that he tried to make the advisement understandable. Maj. op. at 485. However, the trial court, as the trier of fact, is not required to find that Detective Parsons succeeded in what he claims to have attempted. The majority appears to accept Parsons's conclusions instead of considering whether the trial court's contrary findings are supported by the record.

With regard to the defendant's diminished mental capacity, the majority maintains that the record demonstrates her capacity was nonetheless adequate to achieve a knowing and intelligent waiver of her *Miranda* rights:

> Defendant's adequate mental capacity is evidenced by her attempt to mislead the

police in hopes of avoiding prosecution.... Defendant initially deceived Officer Parsons by denying that she has observed Timothy Snead sexually abuse children.... [M]oreover, Defendant chose not to inform police that there had been another incident of sexual abuse involving a second teenage boy.

*Id.* at 487. However, the trial court also made findings, which the record supports, that the defendant has "... problems with giving accurate information. She has problems with verbal and visual memory and with long- and short-term memory." *Kaiser*, No. 00CR498, slip. op at 10; *see also* R. vol. III p. 60. The trial court based this finding on the testimony of the defendant's expert witness, a clinical, licensed psychologist. Thus, the trial court's finding was supported by the record.

These examples illustrate the majority's engagement with the record as a factfinder and its simultaneous lack of deference for the trial court's role as a factfinder. The majority correctly states that this court grants deference to a trial court's findings that are supported by competent evidence in the record, *People v. Pitts*, 13 P.3d 1218, 1221 (Colo. 2000), then disregards this standard of review in reaching its conclusions. The majority, again correctly, also states that where the trial court's findings of fact are clearly erroneous or not supported by the record, this court may set those factual findings aside. *See People v. Mendoza–Balderama*, 981 P.2d 150, 158 (Colo.1999). A review of the record and the trial court's order reveals that the trial court's findings of fact are neither clearly erroneous nor unsupported by the record. The trial court issued a twenty-six page, single-spaced order. That order contains over ten pages and one hundred twenty four findings of fact. The trial court made detailed, thorough, and accurate findings of fact to which I would defer. I would thus agree with the trial court's ultimate conclusion of

law that the defendant did not knowingly and intelligently waive her *Miranda* rights on February 4. Accordingly, I would affirm the trial court's suppression of statements made by the defendant in the two interviews that occurred on February 4.

With regard to the February 5 interview, the trial court concluded that the defendant was not in custody for *Miranda* purposes. This determination is not at issue in this interlocutory appeal.[1] Based on the trial court's conclusion, no *Miranda* warning was required, and none was given. However, the trial court suppressed the statements, reasoning that they were "fruit of the poisonous tree," tainted by the February 4 statements. I disagree with the trial court's conclusion of law regarding suppression of the defendant's February 5 statements.

The People argue that the trial court's conclusion that the February 5 statements are a "fruit of the poisonous tree" is erroneous based on *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). In *Elstad*, the United States Supreme Court held that the "fruit of the poisonous tree" test is not appropriate in the context of a *Miranda* violation because the *Miranda* rights are not themselves rights protected by the constitution. *Id.* at 305, 105 S.Ct. 1285.

The defendant responds that *Elstad* no longer stands for such a proposition because of the Court's recent decision in *Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). *Dickerson* held that *Miranda* was a "constitutional decision." *Id.* at 432, 120 S.Ct. 2326. However, *Dickerson* did not expressly overrule *Elstad*. In its discussion of *Elstad*, the *Dickerson* Court merely stated that *Elstad* "simply recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment." *Id.* at 441, 120 S.Ct. 2326. Accordingly, I believe that *Elstad* remains as controlling precedent for our purposes today.

---

1. In its discussion and analysis, the trial court's order contains several minor typographical errors regarding the dates of the three interviews that occurred. In its findings of fact, the trial court's order lists each interview with the correct date. A review of these findings of fact, along with a review of the record, thus demonstrate that the incorrect dates referred to in the discussion and analysis section of the trial court's order are merely typographical errors. The dates referred to in this dissent are the correct ones, and thus may differ from the dates stated in the cited portions of the trial court's order.

Because the defendant's February 5 statements were voluntary and non-custodial, and because *Elstad* renders a "fruit of the poisonous tree" analysis improper, the trial court erred in suppressing the defendant's February 5 statements. Accordingly, I concur in the majority's conclusion that the February 5 statements were improperly suppressed.

Justice HOBBS and Justice BENDER join in the dissent and concurrence.