2015 CO 18

**The PEOPLE of the State of Colorado, Plaintiff–Appellant,**

v.

**Douglas THAMES, Defendant–Appellee.**

**Supreme Court Case No. 14SA312**

Supreme Court of Colorado.

March 23, 2015

Attorneys for Plaintiff–Appellant: Richard B. Tuttle, Assistant District Attorney, Mark Hand, Chief Deputy District Attorney, Grand Junction, Colorado

Attorneys for Defendant–Appellee: Lord Law Firm, LLC, Kathleen A. Lord, Denver, Colorado, McCarty Law Firm, PC, Garth McCarty, Glenwood Springs, Colorado, Greer Law Firm, PC, Greg Greer, Glenwood Springs, Colorado

JUSTICE HOBBS delivered the Opinion of the Court.

¶ 1 This interlocutory appeal challenges the trial court's order suppressing state- ments made by Douglas Thames, the de- fendant, during custodial interrogation. In- vestigators gave Thames an oral *Miranda* advisement, Thames confirmed that he un- derstood his *Miranda* rights, and he signed a written waiver form before making state- ments the prosecution wishes to use in its case-in-chief. Relying on the defense's ex- pert witness who testified that Thames had difficulty understanding spoken paragraphs concerning abstract ideas, the trial court concluded that he did not knowingly and intelligently waive his *Miranda* rights. Under the totality of the circumstances, we conclude that Thames knowingly and intelli- gently waived his *Miranda* rights. There- fore, we reverse the trial court's order.

**I.**

¶ 2 In June 1994, Jacie Taylor was sexual- ly assaulted and murdered in her apartment on Inness Court in Palisade, Colorado. Al- though Robert Dewey was convicted for Taylor's murder in 1996, he consistently pro- fessed his innocence and applied for assis- tance from the Colorado Justice Review Pro- ject ("JRP").[1] In 2011, during the course of the JRP's investigation of Dewey's case, it identified Thames' DNA at the scene of the Taylor homicide and on her person. Accord- ingly, an investigative team was formed in January 2012 to investigate the Taylor homi- cide. At that time, Thames was an inmate at the Kit Carson Prison in Burlington, Colo- rado, where he was serving a sentence for the unrelated murder of Susan Doll, which occurred in Larimer County, Colorado, in 1986. Thames was convicted in 1996 of first degree murder but has always professed his innocence and also sought assistance from the JRP in relation to his case.

¶ 3 On February 29, 2012, Mesa County Sheriff Investigator Jim Hebenstreit and Colorado Bureau of Investigation Detective Brooks Bennett interrogated Thames at the prison regarding the sexual assault and mur- der of Taylor. The investigators video-re- corded the interrogation, which lasted one

---

1. The Colorado Attorney General's Office formed the JRP with a grant from the National Institute of Justice. The stated goal of the JRP is to identify cases in which post-conviction DNA test- ing could exonerate inmates who have been wrongfully convicted.

hour and fourteen minutes. The investigative team doubted that Thames would consent to talk about the Taylor investigation, so they told him they were there to follow up for the Attorney General's Office and the JRP and they began the interrogation by talking about the Doll case. Although the investigators did not initially tell Thames their true intent in interrogating him, they never told him anything that was untrue.

¶ 4 Approximately four minutes into the interrogation, Investigator Hebenstreit read a *Miranda* advisement to Thames, who said he understood the oral advisement. Investigator Hebenstreit then read aloud a waiver-of-rights form, which Thames signed. About twenty-four minutes into the interrogation, investigators showed Thames a photo of Taylor's body at the murder scene and informed him that his DNA had been present there. They proceeded to question him on why his DNA could have been found there. Thames admitted to living on Inness Court at the time of the Taylor homicide but said he did not know Taylor, never had sexual relations with her, had never been to her apartment, and did not know how his DNA would have come to be in her apartment.

¶ 5 The People charged Thames with first degree murder and first degree sexual assault with force in relation to Taylor's death. The prosecution would like to use statements made during the interrogation in its case-in-chief to show that (1) Thames claimed he never had sexual relations with Taylor and (2) his cool demeanor and lack of emotion when accused of this rape and murder for the first time was unnatural and consistent with his guilt. Thames filed a motion to suppress statements made during the interrogation, alleging that his waiver was not voluntary, knowing, or intelligent.

¶ 6 In support of his assertion, Thames presented the expert testimony of Joan Aneloski, a speech language pathologist and audiologist. After the interrogation took place, Aneloski spent two-and-a-half hours with Thames, during which she administered the Clinical Evaluation of Language Functions Test. She testified that Thames performed in a normal or proficient range on all but one of nineteen sub-tests. The only sub-test in which Thames performed deficiently was "listening to spoken paragraphs," in which he scored in the bottom percentile. Aneloski characterized Thames' ability to understand spoken paragraphs as analogous to someone falling "somewhere in the middle" of the spectrum between very limited and native fluency in a foreign language. Aneloski testified that people who perform deficiently on the "listening to spoken paragraphs" sub-test do not have difficulty understanding and answering simple, direct questions spoken in plain English but have a harder time understanding complex, abstract paragraphs in conversation. In her opinion, Thames' ability to answer simple questions appropriately and to converse was consistent with an inability to understand more complex and abstract spoken paragraphs.

¶ 7 Aneloski testified that she considered the *Miranda* advisement to be abstract and complex. She explained that people with this type of comprehension disability are able to engage in social conversation and often mask their disability when listening to information in paragraph form by being agreeable even when they do not understand what is being said. Aneloski concluded that Thames would not be able to make a knowing and intelligent decision about something of importance to himself if he were "relying on spoken paragraphs to describe his options." Aneloski did not watch the video of the interrogation, did not read the transcripts, and did not ask Thames any questions relating to the interrogation.

¶ 8 The trial court concluded Thames voluntarily waived his *Miranda* rights. However, the trial court determined the prosecution failed to prove by a preponderance of the evidence that Thames knowingly and intelligently waived his *Miranda* rights. In reaching this conclusion, the trial court relied heavily on Aneloski's testimony. Although the court acknowledged that Thames said he understood his *Miranda* rights, it observed his response provided "less evidence of understanding than it otherwise might" because of the deceptive tactics employed by the investigators in securing the interrogation. The trial court also recognized that Thames had prior experience with the criminal justice

system, but in light of other evidence, it could not determine that he understood the *Miranda* advisement he was given.

¶ 9 Accordingly, the trial court suppressed the statements made during the interrogation. The prosecution then initiated this interlocutory appeal pursuant to C.A.R. 4.1 and section 16–12–102(2), C.R.S. (2014).

## II.

¶ 10 Under the totality of the circumstances, we conclude that Thames knowingly and intelligently waived his *Miranda* rights. Therefore, we reverse the trial court's order.

### A. Standard of Review

¶ 11 At the outset of custodial interrogation, the police must deliver a *Miranda* advisement to inform a suspect of his constitutional rights. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *People v. Platt,* 81 P.3d 1060, 1065 (Colo.2004). A *Miranda* advisement is adequate as long as it conveys to the suspect a clear and understandable warning that he has a right to remain silent, anything he says can be used against him in court, he has a right to the presence of an attorney, and, if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires. *People v. Hopkins,* 774 P.2d 849, 853 (Colo.1989).

¶ 12 Suspects can waive their rights upon receiving proper *Miranda* advisements; however, to be valid, a waiver must be voluntary, knowing, and intelligent. *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602; *Platt,* 81 P.3d at 1065. A *Miranda* waiver is considered voluntary unless "coercive governmental conduct—whether physical or psychological— played a significant role in inducing the defendant to make the confession or statement." *Platt,* 81 P.3d at 1065. A waiver is knowing and intelligent when made with awareness of the nature of the right being abandoned and the consequences of the decision to abandon it. *Id.* However, a defendant need not understand every consequence of his decision to waive for his waiver to be knowing and intelligent. *See People v. Al-Yousif,* 49 P.3d 1165, 1169, 1172 (Colo.2002)

(holding the defendant "had the necessary level of rudimentary understanding" to knowingly and intelligently waive his *Miranda* rights).

¶ 13 The prosecution must prove the validity of a defendant's waiver by a preponderance of the evidence. *Platt,* 81 P.3d at 1065. A trial court evaluates a defendant's waiver of *Miranda* rights based on the totality of the circumstances surrounding the custodial interrogation. *Id.* In reaching its determination, the trial court must resolve "disputed facts," and a reviewing court will not overturn such findings of historical fact unless they are clearly erroneous or not supported by the record. *People v. Aguilar-Ramos,* 86 P.3d 397, 400 (Colo.2004). However, the ultimate determination of whether a defendant validly waived his *Miranda* rights requires an application of the law to those facts, and we review that conclusion of constitutional law de novo. *Id.* at 400–01.

¶ 14 In assessing the validity of a *Miranda* waiver, factors a court may consider include, but are not limited to, the following: the time interval between the initial *Miranda* advisement and any subsequent interrogation; whether and to what extent the interrogating officer reminded the defendant of his rights prior to the interrogation by asking if the defendant recalled his rights, understood them, or wanted an attorney; the clarity and form of the defendant's acknowledgement and waiver, if any; the defendant's background and experience in connection with the criminal justice system; the defendant's age, experience, education, background, and intelligence; and whether the defendant has any language barrier to understanding the advisement. *People v. Kaiser,* 32 P.3d 480, 484 (Colo.2001).

### B. Application to This Case

¶ 15 The trial court made several factual findings in its written order. It found that Thames said he understood the oral advisement but that he did not read the written waiver form he signed. Additionally, it found that for the duration of the interrogation, the investigators spoke in a conversational tone with no raised voices, physical

shows of force, or other coercive actions. It also found that Thames had prior experience with the criminal justice system. Finally, it found Aneloski's testimony was credible and consistent with Thames' responses during the interrogation. After a review of the record, we conclude that these factual findings are not clearly erroneous.

¶ 16 We review de novo the application of the law to these facts. The existence of the video recording "enables us to undertake this review not just from the 'cold record,' but— at least in part—in precisely the same manner as the trial court." *Al–Yousif,* 49 P.3d at 1171. Applying the totality of the circumstances test, we conclude that Thames knowingly and intelligently waived his *Miranda* rights.

¶ 17 In reaching its conclusion, the trial court relied on both Aneloski's testimony and our decision in *People v. Fordyce,* 200 Colo. 153, 612 P.2d 1131 (1980). In *Fordyce,* the police interrogated the defendant while she was receiving treatment for first and second degree burns in a hospital's intensive care unit. *Id.* at 1132. Her treatment included intravenous administration of morphine at regular intervals. *Id.* at 1132–33. A toxicology expert testified that an average person under morphine treatment would have difficulty understanding a *Miranda* advisement. *Id.* at 1133. The prosecution did not rebut this testimony. *Id.* Because the trial court's finding that the defendant's mental state was impaired sufficiently that her statements were involuntary was supported by the record, we affirmed the suppression order. *Id.* at 1133–34.[2]

 ¶ 18 However, expert testimony is but one factor in the totality of the circumstances test, and in cases since *Fordyce,* we have clarified that unrebutted expert testimony that a defendant could not understand a *Miranda* advisement is not dispositive in answering the legal question of whether a defendant knowingly and intelligently waived

his *Miranda* rights. We have further clarified that for a waiver to be voluntary and intelligent, a suspect need only minimally understand his rights. *See Al–Yousif,* 49 P.3d at 1172. Here, Aneloski did not testify that Thames had no ability to understand spoken paragraphs; rather, she testified that his ability to understand spoken paragraphs was analogous to someone falling "somewhere in the middle" of the spectrum between very limited and native fluency in a foreign language.

¶ 19 Based upon the facts before us, a more analogous case is *Al–Yousif,* where we concluded that the defendant's English comprehension abilities and rudimentary understanding of his rights sufficiently met *Miranda's* knowing and intelligent standard. *Id.* at 1171–72. In that case, a linguistics professor who had taught the defendant in school testified that the defendant, a native of Saudi Arabia, possessed a fifth-grade reading level in English, yet the *Miranda* advisement required a seventh-grade reading level for comprehension. *Id.* at 1171. The prosecution did not rebut this testimony. *Id.* Additionally, the trial court found the defendant "had trouble grasping abstract concepts in English."[3] *Id.* at 1176 (Bender, J., dissenting). Nevertheless, we determined that the defendant knowingly and intelligently waived his rights because the defendant's English abilities were adequate for casual conversation; the *Miranda* warnings were given in unbroken, quickly read, but short sentences; the defendant asked the detectives for clarification when he did not understand a question or a certain word but asked no questions during the *Miranda* advisement; and the defendant said he understood the *Miranda* rights when they were read to him. *Id.* at 1170–72 (majority opinion). We emphasized that a defendant need not understand every consequence of his decision for his waiver to be knowing and intelligent; instead, "we look to whether the defendant

---

2. A defendant's mental ability to understand the nature and ramifications of a *Miranda* waiver, which is now a separate element, originally was part of the voluntariness determination. *People v. May,* 859 P.2d 879, 882 (Colo.1993).

3. Another expert witness, who held a Ph.D. in Arabic language, Islamic law, and Saudi Arabian culture, testified that while the defendant understood the words of the *Miranda* advisement, he had trouble with the concept of the right to remain silent. *Al–Yousif,* 49 P.3d at 1171.

minimally understood that he did not have to talk to the police, that he could request a lawyer, and that, if he spoke, what he said could be used against him to obtain a conviction." *Id.* at 1169, 1172.

¶ 20 Similarly, in this case, even though Thames had a less-than-average ability to understand spoken paragraphs concerning abstract ideas, his comprehension level was analogous to someone falling "somewhere in the middle" of the spectrum between very limited and native fluency in a foreign language. This testimony indicates that Thames had a rudimentary understanding of spoken paragraphs, which is sufficient to knowingly and intelligently waive one's *Miranda* rights. *See id.* at 1172. Accordingly, Aneloski's testimony does not bar a conclusion that Thames knowingly and intelligently waived his *Miranda* rights. We therefore continue our inquiry.

¶ 21 Before investigators advised Thames of his *Miranda* rights, they questioned him about whether he was represented by counsel in the Doll case. Thames told the investigators that while he had been represented by counsel before, he was currently "doing everything pro se." This exchange indicates that Thames understood the role of attorneys in criminal proceedings, yet he never asked for an attorney to be present during the questioning. Next, Investigator Hebenstreit read Thames a *Miranda* advisement. The video recording shows Thames affirmatively nodding when Investigator Hebenstreit informed him that he had a right to an attorney, and if he could not afford one, one would be provided. After Investigator Hebenstreit finished reciting the *Miranda* advisement, Thames said he understood his *Miranda*

rights, and after the investigator explained the waiver form, Thames signed the waiver. We have consistently observed that a defendant's response that he understands his rights is an important factor in the totality of the circumstances analysis. *See, e.g., Kaiser*, 32 P.3d at 486 ("A defendant's express written and oral waiver is usually strong proof that the waiver is valid." (internal quotation marks omitted)).

¶ 22 Additional factors weigh in favor of admitting Thames' statements under the totality of the circumstances: the interrogation was relatively short; the *Miranda* advisement immediately preceded the interrogation; and during the interrogation, Thames responded appropriately to questions, never expressed any confusion, and corrected the investigators when he believed they were in error. He did not ask the investigators questions regarding his *Miranda* rights at any point during the interrogation, even though before reading the *Miranda* advisement, Investigator Hebenstreit told Thames, "if you have any questions, we'll go over that." This is the type of short and concise statement that Aneloski testified Thames would be able to understand.[4] Thus, the fact that he never asked any questions about his *Miranda* rights further supports the conclusion that he understood them.[5]

¶ 23 Finally, Thames has extensive experience with the criminal justice system—including felony convictions for burglary, theft, first degree criminal trespass, escape, and first degree murder—and he had served sentences to probation, community corrections, and prison. These experiences further support that he was familiar with the concept of personal rights.[6] *See People v. Knedler*,

4. The trial court found that the only spoken paragraph concerning abstract concepts that occurred during the interrogation was the *Miranda* advisement.

5. Aneloski testified that it is common for people with speech language disorders to be agreeable in conversation in order to avoid drawing attention to their inability to understand; however, throughout the interrogation, Thames disputed information proffered by the investigators and corrected them when they misstated facts. Thus, we see no reason that Thames would not similarly ask questions about the *Miranda* advisement if he did not understand it.

6. Aneloski could not give an opinion on whether prior experience receiving a *Miranda* advisement would have affected Thames' ability to understand his *Miranda* rights in this case. However, she testified that the reason people have trouble with more abstract ideas is that they "don't have the redundancy and the ability to predict what is going to come next." This testimony is consistent with the inference that Thames' prior experience with the criminal justice system made it easier for him to understand the abstract concept of personal rights and, therefore, weighs in favor of a knowing and intelligent waiver.

2014 CO 28, ¶ 19, 329 P.3d 242, 246. Although the trial court acknowledged this factor in its analysis, it stated that it could not "find based simply on the fact of [Thames'] prior experience that he understood the Miranda advisement he was given." While we agree that this factor alone is not dispositive, it, along with all of the other evidence weighing in favor of a knowing and intelligent waiver, leads us to conclude that Thames knowingly and intelligently waived his Miranda rights.

¶ 24 Thames need only have had a minimal understanding of his Miranda rights in order to have knowingly and intelligently waived them. Based upon the trial court's factual findings and our independent review of the video interrogation and the record, we conclude that Thames' waiver of his Miranda rights was sufficiently knowing and intelligent to pass constitutional muster.

¶ 25 In applying the totality of the circumstances test, the trial court improperly took into account the tactics used by investigators in securing the interrogation. Specifically, it concluded that the fact that Thames said he understood the Miranda advisement was of little significance due to the tactics used by the investigators—because Thames thought he was there to talk about the Doll case, the court could "infer little from the fact that [Thames] did not stop the conversation to have the advisement explained to him more clearly or to read it carefully." We disagree. As the interrogation continued and the subject of the questioning changed, Thames had the opportunity to consider the choices he faced and reevaluate his interests in order "to make a more informed decision, either to insist on silence or to cooperate." *Berghuis v. Thompkins*, 560 U.S. 370, 388, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010). In fact, we have said that "a suspect's awareness of all possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." *People v. Humphrey*, 132 P.3d 352, 356 (Colo.2006) (quoting *Colorado v. Spring*, 479 U.S. 564, 577, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987)). Therefore, the trial court erred in its determination that the tactics used by the investigators in securing the interrogation in this case are "among the totality of the circumstances bearing on whether the waiver was knowing and intelligent."

¶ 26 The trial court also took issue with Investigator Hebenstreit's characterization of the Miranda advisement as "pretty standard in—in these types of cases," that the waiver was something "we'll go over," and that Thames "just ha[d] [to] . . . sign off on the waiver as long as [he] agree[d] to continue to talk." The court concluded that the reasonable import of these statements "was that the Miranda waiver was a formality to be addressed if [Thames] wanted to take advantage of the opportunity to speak about the Doll case to investigators who were there under the auspices of an organization that could help exonerate him." Because Investigator Hebenstreit minimized the significance of the waiver, the court could infer little from the fact that Thames did not stop the conversation to have the advisement explained to him more clearly. We disagree. That Investigator Hebenstreit said it was standard to read a Miranda advisement when a person is in custody and is questioned about a criminal case in no way diminishes the significance of the waiver nor reduces the recitation to a mere formality. In fact, informing Thames that investigators routinely give Miranda advisements highlighted the importance of these rights and that they should be taken seriously. Accordingly, the trial court erred in characterizing the Miranda advisement as a mere formality and considering the inferences pertinent to this characterization.

¶ 27 Under the totality of the circumstances, we conclude that Thames knowingly and intelligently waived his Miranda rights.

### III.

¶ 28 Accordingly, we reverse the trial court's suppression order and return this case for further proceedings consistent with this opinion.

JUSTICE MÁRQUEZ dissents.

JUSTICE MÁRQUEZ, dissenting.

¶ 29 I respectfully dissent. For essentially the same reasons expressed in my dissent in *People v. N.A.S.*, 2014 CO 65, ¶¶ 60–67, 329 P.3d 285, 298–300 (Márquez, J., dissenting), I believe we lack jurisdiction to hear this appeal. The statements at issue amount to no more than Thames' consistent denial of any involvement in the murder. Indeed, Thames repeatedly insisted that he had no knowledge of, or contact with, the murder victim and that he first learned of the victim only after hearing that she had been killed. In this case, the People do not even suggest how Thames' suppressed statements denying any involvement or contact with the victim constitute an "extrajudicial confession or admission," nor do they articulate how Thames' denials form a "substantial part of the proof of the charge[s]" against him. *See* § 16–12–102(2), C.R.S. (2014); C.A.R. 4.1(a). Consequently, in my view, these suppressed statements do not justify an interlocutory appeal to this court under section 16–12–102(2) or C.A.R. 4.1(a). Therefore, I would dismiss this case for lack of appellate jurisdiction.

¶ 30 Under the Colorado Appellate Rules, "appellate courts may not review interlocutory orders without specific authorization by statute or rule." *Scott v. Scott*, 136 P.3d 892, 897 (Colo.2006) (internal quotation marks omitted). The People seek to invoke our interlocutory appellate jurisdiction under section 16–12–102(2) and C.A.R. 4.1(a). Section 16–12–102(2) permits the prosecution to file "an interlocutory appeal in the supreme court from a ruling of the trial court ... granting a motion to suppress an extrajudicial confession or admission"—but only if the prosecution certifies to the trial court and this court that the appeal is "not taken for the purposes of delay and the evidence is a substantial part of the proof of the charge pending against the defendant." *See also* C.A.R. 4.1(a) (same). The statute and the rule provide very limited grounds for an interlocutory appeal by the prosecution. *See* § 16–12–102(2); C.A.R. 4.1(a); *People v. Null*, 233 P.3d 670, 674 (Colo.2010). This court will not exercise jurisdiction over an interlocutory appeal under C.A.R. 4.1(a) outside of these "extremely narrow" circum-

stances. *People v. Smith*, 254 P.3d 1158, 1160 (Colo.2011) (internal quotation marks omitted); *Null*, 233 P.3d at 674 (internal quotation marks omitted).

¶ 31 Given that compliance with the requirements of section 16–12–102(2) and C.A.R. 4.1(a) concerns this court's jurisdiction, we have looked beyond the prosecution's certification in previous cases to determine whether those requirements in fact have been met. *See People v. Garner*, 736 P.2d 413, 413–14 (Colo.1987) (concluding that the prosecution's brief and the record did not support the certification); *People v. Valdez*, 621 P.2d 332, 333 (Colo.1981) (concluding from an independent review of the record on appeal that the defendant's suppressed statement did not form a "substantial part of the proof" against the defendant); *see also* 14 Robert J. Dieter & Nancy J. Lichtenstein, *Colorado Practice, Criminal Practice & Procedure* § 13.15 (2d ed. 2013) ("The appellate court may dismiss the appeal if the prosecution's brief and the record do not support the conclusion that the statements are a substantial part of the evidence.").

¶ 32 Although we do not second-guess the prosecution's trial strategy, we have at least required that the evidence form affirmative proof of the charges against the defendant. Certainly, an "extrajudicial confession or admission" will almost always be affirmative proof of a charge. By contrast, where the prosecution intends to use a defendant's statement only for possible impeachment purposes, it is not a "substantial part of the proof of the charge." *Garner*, 736 P.2d at 413–14; *see* § 16–12–102(2); C.A.R. 4.1(a). In *Garner*, the prosecution appealed the trial court's suppression of a defendant's statement to an investigating officer. 736 P.2d at 413. The prosecution sought to use the statement to impeach the defendant in the event the defendant elected to testify in her own defense. *Id.* We concluded that, because the prosecution sought to use the statement for impeachment purposes only, "[t]he chronology and procedures followed in a criminal trial require[d] dismissal of th[e] appeal because the evidence suppressed [was] not a substantial part of the proof of the charge." *Id.*

¶ 33 In this case, the People have charged Thames with first degree murder and first degree sexual assault with force. During a custodial interrogation, an investigator showed Thames a photograph of the murder scene and told him that his DNA had been found there. Thames repeatedly denied that he had killed the victim. Indeed, he consistently stated that he did not know her, he had never been to her apartment, he had never had sexual relations with her, and he did not know why his DNA would have been at the scene. He also stated that he had been out partying with his fiancée and other friends on the night of the attack, he did not get home until 3 or 4 a.m., and he first learned of the murder the following day from his fiancée.

¶ 34 In my view, the record and the People's briefing in this case do not support their certification under section 16–12–102(2) and C.A.R. 4.1(a). *See id.*; *Valdez*, 621 P.2d at 333; *N.A.S.*, 329 P.3d at 299 (Márquez, J., dissenting). First, nothing in the record before us allows Thames' suppressed statements to be characterized as an "extrajudicial confession or admission." *See* § 16–12–102(2); C.A.R. 4.1(a). Moreover, the People's briefing fails to articulate how Thames' statements denying any contact with the victim possibly form a "substantial part of the proof of the charge[s]" of first degree murder and first degree sexual assault with force. *See* § 16–12–102(2); C.A.R. 4.1(a).

¶ 35 In their opening brief to this court, the People argue only that these statements "undermine any attempt by the defendant or his counsel to argue that the defendant's DNA was at the crime scene because he had previously been in the victim's apartment consensually and/or had previously had consensual sex with the victim." In other words, the prosecution seeks to use these statements to possibly impeach Thames or rebut a defense theory. In their reply brief, the People simply assert that Thames' statements "denying any contact with the victim" are "compelling evidence" the People seek to introduce at trial in their case-in-chief. Compelling evidence of what? The People do not say, and I cannot discern from the record before us, how Thames' repeated denials form any affirmative "proof of the charge[s]" of murder or sexual assault—let alone a "substantial part" of such proof, as required by section 16–12–102(2) and C.A.R. 4.1(a). Finally, the People assert for the first time in their reply brief that they intend to argue at trial that Thames' "cool demeanor and utter lack of emotion" are consistent with his "truly being guilty of the alleged crimes." Even accepting this belated argument as properly raised, I fail to see how Thames' calm and repeated denial of the accusations against him forms a "substantial part of the proof of the charge[s]" against him. *See* § 16–12–102(2); C.A.R. 4.1(a).

¶ 36 This court has made clear that it will not exercise jurisdiction over an interlocutory appeal under C.A.R. 4.1(a) outside of the "extremely narrow" circumstances justifying our intervention under that rule and section 16–12–102(2). *Smith*, 254 P.3d at 1160 (internal quotation marks omitted); *Null*, 233 P.3d at 674 (internal quotation marks omitted). Here, the People's briefing and the record do not support their certification that the suppressed statements form a "substantial part of the proof of the charge[s] pending against the defendant." *See* § 16–12–102(2); C.A.R. 4.1(a). Thus, in my view, the trial court's suppression of such statements, erroneous or not, does not justify an interlocutory appeal under section 16–12–102(2) and C.A.R. 4.1(a). *See N.A.S.*, ¶¶ 60, 67, 329 P.3d at 298–99 (Márquez, J., dissenting). Because I believe we lack jurisdiction to hear this appeal, I respectfully dissent.