2014 CO 65

**The PEOPLE of the State of Colorado, Plaintiff–Appellant**

v.

**N.A.S., Defendant–Appellee**

**Supreme Court Case No. 14SA74**

Supreme Court of Colorado.

June 30, 2014

Attorneys for Plaintiff–Appellant: J.E. Chostner, District Attorney, Tenth Judicial District, Tamara Qureshi, Deputy District Attorney, Pueblo, Colorado

Attorneys for Defendant–Appellee: Douglas K. Wilson, Public Defender, Maralina J. Schoenfelder, Deputy Public Defender, Pueblo, Colorado

JUSTICE BOATRIGHT delivered the Opinion of the Court.

¶1 In this interlocutory appeal, the People seek review of the trial court's order suppressing statements of the Defendant–Appellee, juvenile N.A.S. The trial court found that N.A.S. was in custody when he made the statements; that he did not waive his *Miranda* rights knowingly, voluntarily, or intelligently; and that the statements were involuntary. We hold that, in light of the totality of the circumstances, N.A.S. was not in custody when he made the statements and that he spoke voluntarily. Accordingly, we reverse the trial court's suppression order and remand for proceedings consistent with this opinion.

### I. Facts and Procedural History

¶2 Several female students at N.A.S.'s school complained to school officials that he had touched them inappropriately. Following these complaints, the school's principal took N.A.S. from the auditorium and escorted him to the assistant principal's office, where N.A.S.'s father and uncle were waiting. N.A.S. seated himself in a chair alongside the office's wall, roughly three feet from where his father was sitting. The assistant principal then informed N.A.S.—who was 13 years old at the time—of the allegations and of their gravity.

¶3 At this point, the school's resource officer,[1] Officer Martinez, entered the office and closed the door behind him. While standing in the office in full uniform,[2] Officer Martinez read N.A.S. his *Miranda* rights from a card, and both N.A.S. and his father indicated that they understood N.A.S.'s rights and were willing to speak with the officer without an attorney present.[3] Officer

1. A school resource officer is a police officer who is assigned to a specific school.

2. Officer Martinez testified that he was standing in the middle of the room, whereas N.A.S. testified that he was blocking the door. The trial court did not find Officer Martinez's exact position in the room to be significant.

3. One of N.A.S.'s teachers testified that N.A.S. struggles with reading comprehension and math, and as a result, he attends 20% of his classes in an "individualized education plan" and takes

Martinez then asked N.A.S. what happened, speaking calmly and never raising his voice. N.A.S. stated that he did not remember any of the alleged incidents. Neither N.A.S.'s uncle—a former corrections officer who was POST-certified[4]—nor his father said anything during the interaction between N.A.S. and Officer Martinez. The interview lasted approximately 5–10 minutes.

¶4 The People subsequently charged N.A.S. with three counts of unlawful sexual contact, one count of third-degree assault, and four counts of harassment. N.A.S. moved to suppress the statements he made to Officer Martinez. After conducting a hearing, the trial court issued an oral order granting the motion to suppress, finding that N.A.S. was subjected to a custodial interrogation; that he did not waive his *Miranda* rights knowingly, voluntarily, or intelligently; and that his statements were involuntary. The People filed this interlocutory appeal.[5]

## II. Standard of Review

¶5 "A trial court's suppression order presents a mixed question of law and fact." *People v. McIntyre*, 2014 CO 39, ¶13, 325 P.3d 583. We defer to the trial court's findings of historical fact if they are supported by competent evidence, but we review the legal effect of those facts de novo. *Id.*

## III. Analysis

¶6 A defendant's statements are admissible at trial only if he makes those statements voluntarily. *Id.* at ¶15 (citing U.S. Const. amends. V, XIV; Colo. Const. art. II, § 25). Statements elicited pursuant to custodial interrogation are inadmissible unless the police provide *Miranda* warnings and the suspect waives his *Miranda* rights; such a waiver is only effective if it is knowing, voluntary, and intelligent. *See Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). But if the suspect is not in custody, *Miranda* does not apply. *See id.*; *People v. J.D.*, 989 P.2d 762, 768 (Colo. 1999) ("'Before a *Miranda* advisement is required, ... the person to whom the advisement is given must be in custody....'" (quoting *People v. Dracon*, 884 P.2d 712, 716 (Colo.1994))). Thus, absent a finding of custody, a suspect's statements to the police are admissible "as long as they are voluntary." *People in Interest of J.C.*, 844 P.2d 1185, 1189 (Colo.1993); *see also McIntyre*, ¶¶19–37 (performing a voluntariness analysis where the defendant was not in custody).

¶7 Here, the trial court found that N.A.S. was in custody because he did not "feel like [he was] free to get up and leave the room." It further found that N.A.S. did not waive his *Miranda* rights knowingly, voluntarily, or intelligently. Then, although the trial judge stated that "I don't think there was any coercion," she nevertheless concluded that N.A.S.'s statements were involuntary. Therefore, in evaluating the propriety of the trial court's suppression order, we must initially determine whether N.A.S. was in custody when he spoke with Officer Martinez. To do so, we first examine the law surrounding custody and its application in the juvenile context. We then determine that, under the totality of the circumstances, N.A.S. was not in custody.[6] Having made that determina-

some tests orally. Because this case involves N.A.S.'s understanding of spoken warnings, the trial court properly declined to consider this testimony.

4. The Peace Officer Standards and Training ("POST") Board must certify any applicant before he is eligible to serve as a peace officer. *POST Certification*, John W. Suthers, Att'y Gen., Colo. Dep't of Law, http://www.coloradoattorneygeneral.gov/departments/criminal_justice/post_board/certification_process (last visited June 24, 2014).

5. Section 19–1–109(2)(a), C.R.S. (2013), affords the prosecution "the same right to appeal questions of law in delinquency cases as exists in criminal cases." Section 16–12–102(2), C.R.S.

(2013), permits the prosecution to file an interlocutory appeal after the trial court grants a motion to suppress evidence, provided the prosecution "certifies to the judge who granted such motion and to the supreme court that the appeal is not taken for the purposes of delay and the evidence is a substantial part of the proof of the charge pending against the defendant." The People here filed such a certificate, and in their Reply Brief, they indicated that they opposed suppression of N.A.S.'s statements because they may seek to introduce the statements in their case-in-chief to rebut his defense of self-defense, which he endorsed as an affirmative defense.

6. Because N.A.S. was not in custody, *Miranda* warnings were not required. Therefore, we need

tion, we next consider whether N.A.S.'s statements were voluntary or were instead the product of police coercion. We conclude that Officer Martinez did not improperly coerce N.A.S. into making the statements but rather that N.A.S. spoke voluntarily.

### A. The Law of Custody in the Juvenile Context

¶ 8 To determine if a suspect was in custody, we consider whether, " 'under the totality of the circumstances, a reasonable person in the [suspect's] position would consider himself to be deprived of his freedom of action *to the degree associated with a formal arrest.*' " *People v. Begay*, 2014 CO 41, ¶ 13, 325 P.3d 1026 (emphasis added in *Begay*) (quoting *People v. Matheny*, 46 P.3d 453, 468 (Colo.2002)). In performing this inquiry, we examine the following factors:

1. the time, place, and purpose of the encounter;
2. the persons present during the interrogation;
3. the words spoken by the officer to the defendant;
4. the officer's tone of voice and general demeanor;
5. the length and mood of the interrogation;
6. whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation;
7. the officer's response to any questions asked by the defendant;
8. whether directions were given to the defendant during the interrogation; and
9. the defendant's verbal or nonverbal response to such directions.

*Id.* at ¶ 17 (formatting altered) (quoting *Matheny*, 46 P.3d at 465–66). These factors are non-exhaustive, but considering them in their totality typically allows courts to ascertain whether the suspect was in custody. *See, e.g., id.* at ¶¶ 26–27 (applying these nine factors and concluding that the defendant was not in custody because "a reasonable person in [his] position would not have con-

sidered himself deprived of his freedom of action to the degree associated with a formal arrest").

¶ 9 In juvenile cases, the same factors still apply, but with an added consideration. Recently, the U.S. Supreme Court declared that courts must consider a juvenile's age when determining custody, as age is "a reality that courts cannot simply ignore." *J.D.B. v. North Carolina*, —— U.S. ——, 131 S.Ct. 2394, 2406, 180 L.Ed.2d 310 (2011) ("[S]o long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer, its inclusion in the custody analysis is consistent with the objective nature of that test."). This announcement comports with our own jurisprudence. *See, e.g., People in Interest of R.A.*, 937 P.2d 731, 737 (Colo.1997) ("Age is a factor to consider in determining if a juvenile is in custody...."). The juvenile's age, however, is not dispositive; rather, courts should weigh it alongside other relevant factors to ascertain whether the juvenile was in custody. *J.D.B.*, 131 S.Ct. at 2406 ("This is not to say that a child's age will be a determinative, or even a significant, factor in every case."); *J.C.*, 844 P.2d at 1190 ("We agree that the age of the person interrogated is a factor to be considered in a totality-of-the-circumstances situation; however, we do not find it to apply to the exclusion of all other factors in the weighing process.").

¶ 10 With this framework in mind, we now address whether N.A.S. was in custody.

### B. N.A.S. Was Not in Custody

¶ 11 As we have demonstrated, the issue here is whether a reasonable person in N.A.S.'s position felt deprived of his freedom of action to the degree associated with a formal arrest. The trial court, however, applied the wrong legal standard, focusing instead on whether N.A.S. felt "free to leave":

> I believe that while he may not have been arrested and there may not have been any threats made, that nevertheless, I don't think that under the circumstances [in

not address whether N.A.S. waived his *Miranda*
rights knowingly, voluntarily, and intelligently.

which] he found himself that day *that he felt that he was free to leave.* The door is closed, there's a police officer there, there's the assistant principal, and there's the principal, all of whom have started this conversation by talking about how this matter is very serious. I don't think that any juvenile ... *would feel like [he was] free to get up and leave the room.* So, I will find that it was a custodial interrogation.

(Emphasis added.)

¶ 12 This analysis clashes with our clear directive regarding custody determinations. Indeed, we have explicitly stated that a "trial court errs by applying the 'free to leave' standard in evaluating whether a suspect is in custody under *Miranda* doctrine." *Begay*, ¶ 16; *see also People v. Pittman*, 2012 CO 55, ¶ 7, 284 P.3d 59 ("The standard for determining whether a person is in custody for *Miranda* purposes is not, as the trial court in this case erroneously articulated, whether a reasonable person would have felt 'free to leave'...."). Again, the critical inquiry is whether a reasonable person in the suspect's position felt deprived of his freedom of action to the degree associated with a formal arrest. That inquiry remains the same in juvenile cases—the only difference is that the court must also consider the juvenile's age in answering the question.

¶ 13 Applying the proper standard, we conclude that N.A.S. was not in custody. To begin with, the interview took place on school grounds rather than at a law enforcement facility, and the principal, not Officer Martinez, summoned N.A.S. from the school auditorium.[7] Additionally, non-law enforcement personnel—including the principal, the assistant principal, and N.A.S.'s uncle—were allowed to remain in the office; the presence of extended family and members of the school's administration belies the formal overtones of a custodial environment.[8] Furthermore, although Officer Martinez remained standing and was in uniform while questioning N.A.S., he spoke calmly and in a normal tone of voice, simply asking N.A.S. what he knew about the allegations. At no point did Officer Martinez issue any directions, nor did he touch N.A.S. or restrict his movements in any way; indeed, the trial court found that N.A.S. was not arrested. N.A.S. did not ask the officer any questions—he merely responded that he did not remember any incidents. Moreover, while Officer Martinez stated that the matter was serious, the discussion was very short, lasting approximately 5–10 minutes. Thus, when viewed in its totality, the interview—which apparently consisted of a single question—cannot be deemed custodial interrogation.

¶ 14 Finally, we do not perceive N.A.S.'s age of 13 to require a different conclusion. We recognize that N.A.S. felt intimidated and scared and that such emotions are perhaps typical of a 13–year–old. But mere fear does not place a juvenile in custody. *See J.C.*, 844 P.2d at 1190 ("It is clear that a person lacking age and experience, when confronted by a police officer, will sustain some sense of fear. We have previously found, however, that, despite a juvenile's fear and ignorance as to her ability to cease the questioning and leave, custody had not been imposed."). Here, apart from the fact that Officer Martinez is a uniformed police officer, nothing surrounding the interview of N.A.S. conjures images of the deprivation of free-

---

7. Civilians can only place a suspect in custody when they act as "agents of the state." *See People v. Robledo*, 832 P.2d 249, 250 (Colo.1992). Here, there is no evidence that the school officials acted at the behest of the police. Additionally, we note that other jurisdictions have held that school officials' conduct has no bearing on the custody determination. *See, e.g., In re Navajo Cnty. Juvenile Action No. JV91000058*, 901 P.2d 1247, 1249 (Ariz.Ct.App.1995) (noting that the "triggering event for *Miranda* warnings is custodial interrogation *by state law enforcement agents*" and that a school principal "did not act as an instrument or agent of the police" (emphasis added)); *In re Corey L.*, 203 Cal.App.3d 1020,

250 Cal.Rptr. 359, 361 (1988) ("Questioning of a student by a principal ... cannot be equated with custodial interrogation by law enforcement officers.").

8. Section 19–2–511(1), C.R.S. (2013), renders inadmissible statements of a juvenile made "as a result of ... custodial interrogation ... unless a parent, guardian, or legal or physical custodian of the juvenile was present at such interrogation." By its terms, the statute does not contemplate extended family members or education personnel.

dom associated with a formal arrest. Indeed, a finding of custody in this case would virtually compel a similar finding in *any* school situation where a police officer questions a student behind a closed door.[9]

¶ 15 Accordingly, we hold that N.A.S. was not in custody when he made the statements to Officer Martinez. Having reached this conclusion, we now consider whether Officer Martinez nevertheless coerced N.A.S. into making the statements or whether N.A.S. instead spoke voluntarily.

## C. N.A.S.'s Statements Were Voluntary

¶ 16 The trial court deemed N.A.S.'s statements to be involuntary. The trial court rooted this finding in its determination that N.A.S. had not properly waived his *Miranda* rights: "I don't really believe that he knowingly or intelligently or voluntarily waived his rights.... I don't think threats were made, I don't think there was any coercion, but I don't think it was a knowing or intelligent or involuntary [sic] waiver. So, I'll find that his statements are involuntary."

¶ 17 This analysis is faulty because it erroneously equates an invalid *Miranda* waiver with an involuntary statement. Rather, the two issues are distinct: Statements obtained in violation of *Miranda* may be *inadmissible*, but they are not necessarily *involuntary*. That is, although the prosecution cannot use such statements in its case-in-chief, the statements may nevertheless be admissible for impeachment purposes. *See Harris v. New York*, 401 U.S. 222, 226, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) ("The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances."); *see also Fare v. Michael C.*, 442 U.S. 707, 717–18, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979) ("Any statements obtained during custodial interrogation conducted in violation of [*Miranda*] may not be admitted against the accused, *at least during the State's case in chief*." (emphasis added)). Thus, while courts should consider a police officer's failure to provide *Miranda* warnings (or a suspect's invalid

waiver of his *Miranda* rights) in determining voluntariness, *see McIntyre*, ¶ 17, such a violation does not per se render a statement involuntary.

¶ 18 Furthermore, *Miranda* only applies to suspects who are in custody. *J.C.*, 844 P.2d at 1188 ("It is undisputed that the *Miranda* safeguards are not triggered unless there is custodial interrogation."). Therefore, because we have already established that N.A.S. was not in custody, the validity of his waiver of his *Miranda* rights is not dispositive, as Officer Martinez was not required to provide *Miranda* warnings in the first place. Instead, we must analyze the admissibility of N.A.S.'s statements pursuant to our standard voluntariness jurisprudence.

¶ 19 To determine voluntariness, we first examine whether, under the totality of the circumstances, a police officer's conduct was " 'coercive so as to overbear the defendant's will.' " *McIntyre*, ¶ 16 (quoting *People v. Zadran*, 2013 CO 69, ¶ 10, 314 P.3d 830). In the event that the police officer's behavior was inappropriately coercive, we then consider whether it " 'played a significant role in inducing the statement[s].' " *Id.* (alteration in original) (quoting *Zadran*, ¶ 10). When evaluating coercion, we look to the following non-exhaustive factors:

1. whether the defendant was in custody;

2. whether the defendant was free to leave;

3. whether the defendant was aware of the situation;

4. whether the police read *Miranda* rights to the defendant;

5. whether the defendant understood and waived *Miranda* rights;

6. whether the defendant had an opportunity to confer with counsel or anyone else prior to or during the interrogation;

7. whether the statement was made during the interrogation or volunteered later;

---

**9.** It bears mention that Officer Martinez would not have questioned N.A.S. with the door open,

especially given the sensitive nature of the allegations.

8. whether the police threatened [the] defendant or promised anything directly or impliedly;

9. the method [or style] of the interrogation;

10. the defendant's mental and physical condition just prior to the interrogation;

11. the length of the interrogation;

12. the location of the interrogation; and

13. the physical conditions of the location where the interrogation occurred.

*Id.* at ¶ 17 (alterations in original) (quoting *Zadran,* ¶ 11).

¶ 20 Applying these factors to this case in light of the totality of the circumstances, we conclude that Officer Martinez's behavior was not coercive.[10] As we have already demonstrated, regardless of whether N.A.S. was free to leave, he was not in custody. Officer Martinez read N.A.S. *Miranda* warnings, and N.A.S. was aware of the situation, as the assistant principal and the officer both explained the seriousness of the allegations. The interview took place on school grounds in the assistant principal's office, and N.A.S.' s father and uncle were present in the office with him; although N.A.S. did not confer with either of his family members during the interview, there is no suggestion that Officer Martinez prevented him from doing so. Officer Martinez neither threatened N.A.S. nor promised him anything, and he spoke in a conversational tone without raising his voice. The entire interview was over within 5–10 minutes.

¶ 21 Furthermore, even assuming, without deciding, that N.A.S. did not validly waive his *Miranda* rights, his lack of waiver does not equate to a finding of coercion, especially given that *Miranda* warnings were not required. Nor does N.A.S.'s age of 13 compel us to conclude that he spoke involuntarily. It is true that children may be more pliable than adults and may, in some instances, feel bound to comply with figures of authority. *See J.D.B.,* 131 S.Ct. at 2403 ("We have observed that children ... 'are more vulnerable or susceptible to ... outside pressures'

than adults...." (second omission in original) (quoting *Roper v. Simmons,* 543 U.S. 551, 569, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005))). But police officers can counter that inherent susceptibility not only by providing *Miranda* warnings but also by speaking calmly, as Officer Martinez did here. To wit, even N.A.S.'s uncle—a former corrections officer who was present while Officer Martinez questioned N.A.S.—testified of the interview that "I didn't feel I had to stop something." Finally, it bears repeating that N.A.S. did not admit to the allegations; on the contrary, he *denied* knowledge of the incidents. We must consider the seemingly exculpatory nature of this statement when evaluating whether the officer's conduct was coercive.

¶ 22 In short, under the totality of the circumstances, Officer Martinez did not overbear N.A.S.'s will. He simply asked N.A.S. what he knew about the alleged incidents, and N.A.S. responded that he did not remember any such incidents. We cannot deem that response to be the product of police coercion. Rather, we conclude that N.A.S. spoke voluntarily.

## IV. Conclusion

¶ 23 For the foregoing reasons, we hold that N.A.S. was not in custody when he spoke to Officer Martinez and that he spoke voluntarily. Accordingly, we reverse the trial court's suppression order and remand for proceedings consistent with this opinion.

JUSTICE HOOD concurs in the judgment, and JUSTICE HOBBS joins in the concurrence in the judgment.

JUSTICE MÁRQUEZ dissents.

JUSTICE HOOD, concurring in the judgment.

¶ 24 While I agree that the trial court ultimately erred by suppressing N.A.S.'s statements to the School Resource Officer (S.R.O.), I respectfully reject the majority's conclusion that N.A.S. was not in "custody" under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *J.D.B.*

---

10. Although we are not bound by a trial court's legal conclusions, we note that the trial judge

here stated unequivocally that "I don't think there was any coercion."

*v. North Carolina,* — U.S. —, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011). Because N.A.S. validly waived his *Miranda* rights and spoke voluntarily, I nonetheless concur in the court's judgment. I write separately to explain why.

## I. Facts

¶ 25 The principal interrupted 13–year–old N.A.S.'s seventh-grade class. He removed him from the auditorium and escorted him to a ten-foot-by-twelve-foot room, where his father and uncle waited with the assistant principal.

¶ 26 N.A.S. looked "really scared, really afraid" when he entered. He was seated too far from his father and uncle even to whisper with them; he had no chance to talk to his family members before questioning began. The assistant principal told N.A.S. that he was in trouble and that the accusations were "serious."

¶ 27 The principal left the office and returned with the S.R.O., a man six feet, four inches tall who wore a uniform, a badge, a gun, and handcuffs. They closed the door. The S.R.O. recognized N.A.S. from special education classes and thus knew his grade and approximate age.[1] The principal and the S.R.O. remained standing in the middle of the small room, between N.A.S. and the door. The S.R.O. stayed "right ... by" N.A.S. with his hands on his hips. The uncle described his demeanor as "real serious" and his physical presence as "big."

¶ 28 No one told N.A.S. that he was free to leave.

¶ 29 The S.R.O. began by reading N.A.S. his *Miranda* rights from a card. According to the officer, N.A.S. and his father appeared to understand N.A.S.'s rights and agreed to talk with him.

¶ 30 The S.R.O. repeated that the charges against N.A.S. were very serious and could affect the rest of his life. He then asked him what had happened with the girls. N.A.S. was "very overwhelmed" and "scared" be-

cause he "didn't know what [he] was getting [him]self into." He denied improperly touching the girls.

¶ 31 Five or ten minutes into the interrogation, the S.R.O. received a phone call. When he hung up, he told the group that N.A.S. would not be going home that night because he was going to "P.Y.C."—Pueblo Youth Services Center. N.A.S. immediately started crying.

¶ 32 The S.R.O. told N.A.S. that he was not free to leave, then handcuffed him, arrested him, and transported him to P.Y.C.

## II. Analysis

¶ 33 The majority concludes that this encounter "cannot be deemed custodial interrogation." Maj. op. ¶13. I disagree.

### A. A New Lens for Juvenile Custody

¶ 34 The Fifth Amendment requires that police advise criminal suspects of their constitutional rights before custodial interrogation. *Miranda,* 384 U.S. at 471, 86 S.Ct. 1602; *People v. Knedler,* 2014 CO 28, ¶ 10, 329 P.3d 242. In evaluating whether a juvenile suspect is in custody under *Miranda,* the ultimate inquiry remains whether there was a formal arrest or restraint of freedom to the degree associated with formal arrest. *J.D.B.,* 131 S.Ct. at 2402.

¶ 35 And yes, as the majority notes, we long ago held that a juvenile's age should be a factor in evaluating whether there is custodial interrogation. *In re Interest of R.A.,* 937 P.2d 731, 737 (Colo.1997) ("Age is a factor to consider in determining if a juvenile is in custody...."). Thus, we have been part of the growing "'judicial recognition' that children cannot be viewed simply as miniature adults." *J.D.B.,* 131 S.Ct. at 2404 (quoting *Eddings v. Oklahoma,* 455 U.S. 104, 115–16, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)).

¶ 36 As I read *J.D.B.,* however, the analysis of whether a juvenile is in custody under *Miranda* has changed even more fundamentally. Rather than age simply being a factor

---

1. N.A.S. had an Individualized Education Plan (I.E.P.) for special education because he struggled in math and language arts. He spent 20% of his school day in special education classes and

the rest in the regular classroom, where he received preferential seating near the board and frequent checks for understanding of written and oral material.

(in the sense that duration of interrogation is a factor), we must now consider how a "reasonable child" would perceive the situation. *Id.* at 2403. In other words, instead of imagining a "reasonable person" in the juvenile's situation, such circumstances "must be evaluated through the lens of a reasonable juvenile." [2]

¶ 37 This is new. In evaluating whether a significant change in the law has occurred, we need look no further than the dissent in *J.D.B.* Justice Alito described the holding as possibly inviting a "fundamental transformation" and an "extreme makeover" of the *Miranda* custody test. *Id.* at 2409–10 (Alito, J., dissenting). [3]

¶ 38 The facts in *J.D.B.* are also instructive. There, a uniformed police officer interrupted 13–year–old J.D.B. in his social studies class, removed him from the classroom, and took him to a school conference room, where two police officers questioned him behind a closed door in the presence of the assistant principal and another school administrator. *Id.* at 2399 (majority opinion). The officers never informed J.D.B. that he was free to leave, nor did they give him the opportunity to speak with his guardian. *Id.* J.D.B.' s statements were later offered against him in court, after the trial court denied a motion to suppress. *Id.* at 2400. The Supreme Court reversed the trial court's order because it failed to take J.D.B.'s age into account. *Id.* at 2408.

¶ 39 Admittedly, J.D.B.'s guardian was not present and the interrogation lasted some 30–45 minutes; for those reasons, the case is factually distinguishable. But many of the circumstances that animated the Supreme Court's "reasonable child" proclamation are present here too.

## B. N.A.S. Was in Custody

¶ 40 The salient features of N.A.S.'s schoolhouse interrogation are much the same as those in J.D.B.'s case, right down to his age. Here, the encounter occurred at school in a small, closed room; a uniformed police officer and the two school officials were present; the officer and the principal stood during the interrogation; N.A.S. did not have an opportunity to speak to a parent or legal guardian alone (although his father and uncle were also in the room); the officer did not tell N.A.S. that he was free to leave; the officer warned N.A.S. that the charges were very serious and could affect the rest of his life; the officer's tone and demeanor were serious; and the mood was somber and intimidating, especially for a 13–year–old child.

¶ 41 Furthermore, schoolhouse interrogation may serve to amplify, rather than ease, a sense of restraint for a student "whose presence at school is compulsory and whose disobedience at school is cause for disciplinary action." *J.D.B.*, 131 S.Ct. at 2405. The

---

2. Marsha L. Levick & Elizabeth–Ann Tierney, *The United States Supreme Court Adopts a Reasonable Juvenile Standard in J.D.B. v. North Carolina for Purposes of the Miranda Custody Analysis: Can a More Reasoned Justice System for Juveniles Be Far Behind?*, 47 Harv. C.R.-C.L. L.Rev. 501, 503 (2012); *accord Sturm v. Superintendent of Indian River Juvenile Corr. Facility*, 514 Fed.Appx. 618, 624 (6th Cir.), *cert. denied*, —— U.S. ——, 134 S.Ct. 96, 187 L.Ed.2d 72 (2013) (applying "reasonable juvenile" standard); *In re T.W.*, 2012 -Ohio- 2361 at ¶¶ 28–29, 2012 WL 1925656 (Ohio Ct.App.) (same); *In re C.M.A.*, No. 03–12–00080–CV, 2013 WL 3481517, at *4 (Tex.App. July 2, 2013) (applying "reasonable child of the same age" standard).

3. *J.D.B.* is part of the Court's trend toward observing that "criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed." *Graham v. Florida*, 560 U.S. 48, 76, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). In 2005, the Court abolished the death penalty for juveniles, reasoning that children's " 'lack of maturity and … underdeveloped sense of responsibility,' " coupled with their vulnerability to outside influences, make it impossible to reliably classify them among the worst offenders. *Roper v. Simmons*, 543 U.S. 551, 569, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (quoting *Johnson v. Texas*, 509 U.S. 350, 367, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993)). Extending its logic that children require a different degree of constitutional protection than adults, the Court likewise banned mandatory sentences of life without parole for juveniles. *Miller v. Alabama*, —— U.S. ——, 132 S.Ct. 2455, 2475, 183 L.Ed.2d 407 (2012) (homicide); *Graham*, 560 U.S. at 82, 130 S.Ct. 2011 (nonhomicide crimes). In *Graham*, the Court noted that developments in brain science demonstrate "fundamental differences between juvenile and adult minds," and "the features that distinguish juveniles from adults also put them at a significant disadvantage in criminal proceedings." 560 U.S. at 68, 78, 130 S.Ct. 2011.

schoolhouse setting inherently curtails a child's freedom of movement. While arguably less restrictive than questioning at a police station, schoolhouse interrogation is far more custodial in nature than questioning a child at his house or over the phone. *See People v. Howard*, 92 P.3d 445, 452 (Colo. 2004) (holding that a 17–year–old questioned by an officer in the driveway outside of his home was not in custody); *In re Interest of J.C.*, 844 P.2d 1185, 1189–90 (Colo.1993) (holding that a juvenile questioned by an officer over the phone was not in custody).

¶ 42 The majority emphasizes that the principal, not the S.R.O., summoned N.A.S. from the school auditorium. Maj. op. ¶ 13. That is true, but it does nothing to alter the fact that the S.R.O. subsequently acted in concert with school officials in conducting the interview. Also, that it was the principal— the school's top authority figure—who removed N.A.S. from class (and not the S.R.O.) hardly lessens the compulsory nature of N.A.S.' s attendance at the interrogation. Nor does the presence of the school administrators somehow diminish the S.R.O.' s domination of the atmosphere. What reasonable child would feel less constrained because more authority figures, his principal and assistant principal, joined the S.R.O. to tell him just how much trouble he was in?

¶ 43 The majority cites *People v. Robledo*, 832 P.2d 249 (Colo.1992), for the proposition that civilians can place a suspect in custody only when they act as "agents of the state." Maj. op. ¶ 13 n. 7. In *Robledo*, we affirmed a trial court's conclusion that a counselor/client manager at a juvenile detention facility was acting as an agent of law enforcement when he conducted custodial interrogation of a juvenile murder suspect. To the extent that the majority implicitly seeks to distinguish the counselor/client manager from the school officials here, it will find no quarrel from me. I agree that these school officials acting alone did not, and indeed could not on these facts, place N.A.S. in custody. This distinction between civilians and law enforcement is irrelevant, however, because N.A.S. was in custody as a result of the circumstances surrounding the interrogation in the assistant principal's office, including the fact that the

S.R.O. was in the closed room playing an active role in the interrogation.

¶ 44 Consequently, the majority's reliance on *In re Navajo County Juvenile Action No. JV91000058*, 901 P.2d 1247, 1249 (Ariz.Ct. App.1995), and *In re Corey L.*, 203 Cal. App.3d 1020, 250 Cal.Rptr. 359, 361 (1988), is misplaced. *See* maj. op. ¶ 13 n. 7. In both cases, school principals elicited incriminating statements from juveniles without law enforcement present. That is not what happened here. As the majority acknowledges, *id.* at ¶ 3, the S.R.O. entered the office and closed the door behind him before asking N.A.S. what happened.

¶ 45 Recently, the Supreme Court of Kentucky relied on *J.D.B.* in holding that the mere presence of an S.R.O., acting quietly in tandem with the principal, rendered custodial a schoolhouse interview of a juvenile behind closed doors:

> The presence of law enforcement in schools on a daily basis serves notice that crimes will be charged for conduct the officer believes violates the law. This is not inappropriate, but it does change the nature of questioning a child for school discipline purposes to an improper police interrogation absent constitutional safeguards.
>
> Administering school discipline does not require the participation of law-enforcement. Administering the law does.
>
> Consequently, a proper balance is struck if school officials may question freely for school discipline and safety purposes, but any statement obtained may not be used against a student as a basis for a criminal charge when law enforcement is involved or if the principal is working in concert with law enforcement in obtaining incriminating statements, unless the student is given the *Miranda* warnings and makes a knowing, voluntary statement after the warnings have been given.

*N.C. v. Commonwealth*, 396 S.W.3d 852, 864– 65 (Ky.), *cert. denied*, —— U.S. ——, 134 S.Ct. 303, 187 L.Ed.2d 154 (2013). I need not go as far to resolve this case (because here the S.R.O. actively participated in the interrogation), but I agree that custody may

arise when school officials work in concert with law enforcement.

¶ 46 The majority is also concerned that "a finding of custody in this case would virtually compel a similar finding in *any* school situation where a police officer questions a student behind a closed door." Maj. op. ¶ 14 (emphasis in original). If the juvenile is 13 years old, and uniformed law enforcement plays an active role in interrogating that child in a small, closed room, that may be true. But as the child gets closer to the age of majority, the analysis may change. While this more idiosyncratic approach runs counter to traditional *Miranda* analysis, it is nonetheless what *J.D.B.* compels. *See J.D.B.*, 131 S.Ct. at 2407 ("[O]fficers and judges need no imaginative powers, knowledge of developmental psychology, training in cognitive science, or expertise in social and cultural anthropology to account for a child's age. They simply need the common sense to know that a 7–year–old is not a 13–year–old and neither is an adult."); *see also id.* at 2403 ("[E]vents that 'would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens.'" (quoting *Haley v. Ohio*, 332 U.S. 596, 599, 68 S.Ct. 302, 92 L.Ed. 224 (1948) (plurality opinion))).

¶ 47 Moreover, I am not persuaded that the majority's slippery slope argument should militate against finding custody. If anything, I believe we should be more alarmed that finding no custody deprives the juvenile of the statutory protections of section 19–2–511(1), C.R.S. (2013).[4] Based on the majority's holding today, there was no obligation for law enforcement to contact a parent or legal guardian before interrogating N.A.S. about what they termed a "serious" criminal offense. *See Howard*, 92 P.3d at 451 (section 19–2–511(1) protects only those juveniles that are in *Miranda* custody).

¶ 48 The majority rightly notes that the trial court blurred the custody standard when it focused on whether N.A.S. felt "free to leave," an error we have corrected many times. *See, e.g., People v. Begay*, 2014 CO 41, ¶ 15, 325 P.3d 1026 (discussing the distinction between custody under the Fifth Amendment and seizure under the Fourth Amendment).

¶ 49 That said, the trial court did start by framing the issue as whether N.A.S. "would have considered himself *deprived of his freedom of action in a significant way ... such as to make it a custodial interrogation.*" (Emphasis added.) This echoes the Supreme Court's original words in *Miranda*: "To summarize, we hold that when an individual is taken into custody or otherwise *deprived of his freedom by the authorities in any significant way and is subjected to questioning,* the privilege against self-incrimination is jeopardized." 384 U.S. at 478, 86 S.Ct. 1602 (emphasis added).

¶ 50 The trial court also took stock of the juvenile's "age and the circumstances under which the proceeding took place." Importantly, the court described the circumstances on which it relied: the door was closed; the police officer was present, as were the principal and the assistant principal; and the conversation started by warning N.A.S. that the matter was very serious.

¶ 51 "Review[ing] the legal effect of those facts de novo," as the majority does, maj. op. ¶ 5, I agree with the trial court that N.A.S. was in custody. The child's approximate age was known to the S.R.O. at the time of police questioning or would have been objectively apparent to a reasonable officer, based on the middle school setting and the S.R.O.'s familiarity with N.A.S. Viewed from the perspective of a reasonable 13–year–old child, the S.R.O. restrained N.A.S.' s freedom of

4. Section 19–2–511(1) states in full:
No statements or admissions of a juvenile made as a result of the *custodial interrogation* of such juvenile by a law enforcement official concerning delinquent acts alleged to have been committed by the juvenile shall be admissible in evidence against such juvenile unless a parent, guardian, or legal or physical custodian of the juvenile was present at such interrogation and the juvenile and his or her parent, guardian, or legal or physical custodian were advised of the juvenile's right to remain silent and that any statements made may be used against him or her in a court of law, of his or her right to the presence of an attorney during such interrogation, and of his or her right to have counsel appointed if he or she so requests at the time of the interrogation.... (Emphasis added.)

action to a degree commensurate with formal arrest.

### C. The Waiver Was Valid

¶ 52 Because I would find custody, I address the additional issue of whether N.A.S.'s waiver of his *Miranda* rights was valid. In my view, it was.

¶ 53 The validity of a *Miranda* waiver turns on two elements: whether the waiver was free from governmental coercion, and whether it was knowingly and intelligently made with full awareness of the right and the consequences of relinquishing it. *Knedler*, ¶ 10. A *Miranda* waiver is considered voluntary unless coercive governmental conduct played a "significant role" in inducing the defendant to make the confession or statement. *People v. Ferguson*, 227 P.3d 510, 513 (Colo.2010).

¶ 54 In determining whether a suspect knowingly and intelligently waived his *Miranda* rights, courts must consider "the defendant's age, experience, education, background, and intelligence." *People v. Kaiser*, 32 P.3d 480, 484 (Colo.2001); *see also People v. Cunningham*, 678 P.2d 1058, 1060–61 (Colo.App.1983) (a juvenile's waiver, like an adult's, is subject to a totality-of-the-circumstances analysis).

¶ 55 Here, the officer recited the *Miranda* rights from a card, and N.A.S. and his father appeared to understand them. Neither asked any questions about those rights. N.A.S. testified that he remembered the S.R.O. asking whether, having his rights in mind, he wished to speak with him. According to the S.R.O., N.A.S. and his father orally agreed to answer his questions.[5]

¶ 56 In evaluating the validity of this waiver, it is significant that N.A.S.'s father was present. One purpose of section 19–2–511 is to "provide[ ] a juvenile with parental guidance during a custodial interrogation to ensure that any waiver of a juvenile's consti-

tutional rights will be made knowingly and intelligently." *People v. Lehmkuhl*, 117 P.3d 98, 102 (Colo.App.2004) (examining the statutory parental presence requirement for custodial interrogation in addressing the voluntariness of a juvenile's consent to a warrantless search). When there is a finding of custody, we can have greater confidence that any subsequent waiver will be knowing, intelligent, and voluntary, because the statute requires an adult allied with the child to be present to ensure as much. In this case, the majority implicitly concludes that this statutory parental presence requirement did not apply. All the same, the father and uncle were there. Their presence did little to mitigate the sense of custody a reasonable 13–year–old child would perceive under these circumstances, but it serves to legitimize what otherwise would have been at best a highly questionable relinquishment of rights.

¶ 57 Additionally, N.A.S. offered no evidence of unduly coercive behavior on the part of the S.R.O., nor did the court find any. Because there is no evidence that any overreaching by law enforcement played a significant role in N.A.S.'s statements, his waiver was voluntary.

¶ 58 Therefore, I would conclude N.A.S. validly waived his *Miranda* rights.

### III. Conclusion

¶ 59 Because N.A.S. validly waived his *Miranda* rights and because I agree that no coercive conduct rendered his statements involuntary, I respectfully concur in the court's judgment that the trial court erred in suppressing N.A.S.'s statements.

I am authorized to state that JUSTICE HOBBS joins in the concurrence in the judgment.

---

5. The S.R.O. did not present them with a written waiver, nor did they have the chance to see *Miranda* warnings in writing. The S.R.O. testified that his standard practice with juveniles is to administer the warnings with a written form and secure the waiver with both the juvenile's and the guardian's signatures. Here, he did not.

Although the use of a written waiver is the better practice, the absence of a written, or even oral, statement of waiver does not necessarily require suppressing a defendant's statements. *People v. Ferran*, 196 Colo. 513, 515, 591 P.2d 1013, 1014 (1978); *accord In re Interest of J.L.M.*, 8 P.3d 435, 438 (Colo.1999).

JUSTICE MÁRQUEZ, dissenting.

¶ 60 I respectfully dissent. The People brought this interlocutory appeal invoking our jurisdiction under section 16–12–102(2), C.R.S. (2013), and C.A.R. 4.1(a). Under both the statute and the rule, the People must certify to the trial court and to this court that the appeal is not taken for purposes of delay and, importantly, that the evidence is a "substantial part of the proof of the charge pending against the defendant." In *People v. Garner*, 736 P.2d 413, 413–14 (Colo.1987), we held that, where the prosecution seeks to use the defendant's statements simply for impeachment purposes, such statements do not constitute a substantial part of the prosecution's proof of the charge, and therefore do not justify an interlocutory appeal. Here, the People represented both to the trial court and in their opening brief to this court that they seek to use N.A.S.' s statements only for impeachment. Thus, under *Garner*, the trial court's suppression of such statements, erroneous or not, does not justify an interlocutory appeal under section 16–12–102(2) and C.A.R. 4.1(a). Therefore, I would dismiss this case for lack of appellate jurisdiction.

## I.

¶ 61 Under the Colorado Appellate Rules, "appellate courts may not review interlocutory orders without specific authorization by statute or rule." *Scott v. Scott*, 136 P.3d 892, 897 (Colo.2006) (internal quotation marks and citation omitted). Section 19–2–903(2), C.R.S. (2013), expressly authorizes the prosecution in a delinquency case to appeal "any decision of the trial court as provided in section 16–12–102, C.R.S." Section 16–12–102(2), C.R.S. (2013), permits the prosecution to file an interlocutory appeal in the supreme court from a "ruling of the trial court ... granting a motion to suppress an extrajudicial confession or admission"—but only if the prosecution certifies to the trial court and to this court that the appeal is "not taken for the purposes of delay and the evidence is a substantial part of the proof of the charge pending against the defendant." *See also* C.A.R. 4.1(a) (same). The statute and the rule provide very limited grounds for an interlocutory appeal by the prosecution.

*People v. Null*, 233 P.3d 670, 674 (Colo.2010). This court will not exercise jurisdiction over an interlocutory appeal under C.A.R. 4.1(a) outside of these "extremely narrow" circumstances. *People v. Smith*, 254 P.3d 1158, 1160 (Colo.2011) (internal quotation marks and citations omitted).

## II.

¶ 62 In *People v. Garner*, 736 P.2d 413, 413–14 (Colo.1987), we held that where the prosecution seeks to use a defendant's statement only for *impeachment purposes*, such a statement is not a substantial part of the proof of the charge. In *Garner*, the prosecution appealed the trial court's suppression of a statement made by the defendant to an investigating officer. *Id.* at 413. The prosecution sought to use the statement to impeach the defendant in the event the defendant elected to testify in her own defense. *Id.* The prosecution certified, pursuant to C.A.R. 4.1(a), that the defendant's statement was "a substantial part of the proof of the charge pending against the defendant." *Id.* This court disagreed, concluding that because the prosecution sought to use the statement for impeachment purposes only, "[t]he chronology and procedures followed in a criminal trial require dismissal of this appeal because the evidence suppressed is not a substantial part of the proof of the charge." *Id.* Because the suppressed statements were not a substantial part of the prosecution's proof, we concluded that the trial court's ruling did not "fall within that limited category of cases that we review on interlocutory appeal." *Id.* at 414; *see also* 15 Robert J. Dieter et al., *Colorado Practice, Criminal Practice & Procedure* § 22.25 (2d ed. 2013) ("The suppression of statements sought only for impeachment use will not be resolved on an interlocutory appeal." (citing *Garner*, 736 P.2d at 413)); 14 Robert J. Dieter et al., *Colorado Practice, Criminal Practice & Procedure* § 13.15 (2d ed. 2013) ("The appellate court may dismiss the appeal if the prosecution's brief and the record do not support the conclusion that the statements are a substantial part of the evidence.").

¶ 63 Here, N.A.S. made the statements at issue to Officer Martinez, the school resource

officer, during a meeting in the assistant principal's office after several female classmates accused N.A.S. of touching them inappropriately. Maj. op. ¶¶ 2–3. During a brief exchange that lasted approximately 5–10 minutes, Officer Martinez asked N.A.S. what had happened. Maj. op. ¶ 3. According to Officer Martinez's testimony at the suppression hearing, N.A.S. responded that "nothing happened" or that he "didn't recall anything that happened." N.A.S. later sought to suppress these statements, and the trial court granted the motion. Maj. op. ¶ 4.

¶ 64 During the hearing on the motion to suppress, the trial court observed, "I'm kind of mystified about why I'm having this hearing. Is the prosecution going to use those statements?" In response, the prosecution signaled its intent to use the statements only to impeach N.A.S.: "Your Honor ... we were willing to stipulate to suppression, but use [the statements] for voluntariness purpose[s]." As the majority accurately states: "Statements obtained in violation of *Miranda* may be *inadmissible*, but they are not necessarily *involuntary*. That is, although the prosecution cannot use such statements in its case-in-chief, the statements may nevertheless be admissible for impeachment purposes." Maj. op. ¶ 17. Thus, the prosecution's statements to the trial court indicate its willingness to forgo the use of the statements during its case-in-chief, as long as their status as "voluntary" statements was preserved, ensuring they could be admitted for impeachment purposes. In their opening brief to this court, the prosecution confirmed that these statements were intended for possible impeachment only: "At the beginning of the second day of motions, *the People established the importance of those statements for impeachment purposes* given the nature of the defense." *See* People's Opening Br. 16 (emphasis added).

¶ 65 Under this court's decision in *Garner*, such statements do not qualify as a "substantial part of the proof of the charge," and therefore do not justify an interlocutory appeal. In *Garner*, we looked beyond the prosecution's certification required by C.A.R. 4.1(a) and concluded that the prosecution's brief and the record did not support that certification. 736 P.2d at 413. In my view, the prosecution's brief and the record in this case likewise do not support its C.A.R. 4.1(a) certification. The prosecution has not suggested how N.A.S.'s statements that "nothing happened" or that he "didn't recall anything that happened" possibly form a "substantial part of the proof" of the charges of unlawful sexual contact, assault, and harassment. Rather, the prosecution indicated to the trial court—and confirmed in its opening brief to this court—that it intended to use the statements at issue for impeachment only.[1]

¶ 66 In its reply brief to this court, the prosecution asserts for the first time that it could use N.A.S.'s statements in its case-in-chief to rebut N.A.S.'s affirmative defense of self-defense by showing that N.A.S. did not intend to defend himself. Yet even assuming that evidence to disprove a defendant's affirmative defense qualifies as a "substantial part of the proof of the charge" against the defendant, the prosecution fails to explain how N.A.S.'s statements that he did not remember any of the alleged incidents actually disprove self-defense. In other words, to assert self-defense, N.A.S. will have to acknowledge that something *did* happen with the three students, and the issue will be whether he acted in *self-defense*. N.A.S.'s statements that "nothing happened" or that he "didn't recall anything that happened" have nothing to do with whether he acted in self-defense.

### III.

¶ 67 In short, as in *People v. Garner*, 736 P.2d 413 (Colo.1987), the prosecution's brief and the record do not support the prosecution's certification that the suppressed statements here form "a substantial part of the proof of the charge pending against the defendant," as required by C.A.R. 4.1(a) and section 16–12–102(2), C.R.S. (2013). Because

---

1. For that matter, we note that Officer Martinez's testimony indicates that N.A.S. made the same statements to the school's assistant principal. The prosecution has not explained why it must use N.A.S.'s suppressed statements for impeachment, when it could instead call the assistant principal.

I believe we lack jurisdiction to hear this appeal, I respectfully dissent.