1
 2025 CO 4 The People of the State of Colorado, Plaintiff-Appellant v. Tien Dinh Pham, Defendant-Appellee No. 24SA225
Supreme Court of Colorado, En Banc
February 3, 2025
 
          
 Jefferson County District Court Case No. 23CR1739 Honorable
 Tamara S. Russell, Judge
 
 
          
 Attorneys for Plaintiff-Appellant: Alexis King, District
 Attorney, First Judicial District Rebecca A. Adams, Senior
 Appellate Deputy District Attorney Golden, Colorado
 
 
          
 Attorneys for Defendant-Appellee: Megan A. Ring, Public
 Defender Alex Taufer, Deputy Public Defender Golden, Colorado
 
 2
 
          
 JUSTICE HOOD, JUSTICE HART, JUSTICE SAMOUR, and JUSTICE
 BERKENKOTTER joined. JUSTICE BOATRIGHT, joined by CHIEF
 JUSTICE MARQUEZ, dissented.
 
 
          
 OPINION
 
 
          
 GABRIEL, JUSTICE
 
 3
 
          ¶1
 In this interlocutory appeal, the People ask us to reverse
 the trial court's order suppressing the results of a
 police dog sniff search of the interior of Tien Dinh
 Pham's vehicle.
 
 
          ¶2
 We conclude that although the trial court erred in finding
 that removing Pham from his vehicle during a lawful traffic
 stop was a search, the court correctly determined that the
 dog's entry into Pham's vehicle, which was
 facilitated by the police, was a search under the Fourth
 Amendment and that this search was conducted without the
 requisite probable cause.
 
 
          ¶3
 Accordingly, we affirm the trial court's suppression
 order.
 
 
          I.
 Facts and Procedural Background
 
 
          ¶4
 After watching Pham's vehicle drive away from a house in
 an allegedly high-crime area, Lakewood police agents began
 following him, observed a lane change violation, and
 initiated a traffic stop. Pham pulled into a parking lot,
 where the agents ordered him out of the vehicle. Although it
 appears that Pham initially opened the door from inside the
 car, the agent at the door immediately put his hand on the
 top of the car door. Pham then got out of the car, and the
 agent conducted a brief pat down and quickly directed Pham to
 a different location in the parking lot, leaving the car door
 open.
 
 4
 
          ¶5
 Agent Kyle Winters then deployed a drug-detection dog and
 directed the dog to conduct a free air sniff of Pham's
 vehicle. When the dog got to the open driver's side door,
 Agent Winters partially closed the door to allow him and the
 dog to maneuver around it. Agent Winters then reopened the
 door sufficiently to allow the dog to place his head and
 front paws inside the vehicle, at which point the dog alerted
 to the presence of drugs. After the dog did so, Agent Winters
 walked the dog around the rest of the car, and the dog did
 not alert again until he returned to the open door. The
 agents on scene thereafter searched the vehicle and found,
 among other things, suspected methamphetamine, cocaine,
 heroin, drug paraphernalia, and two handguns. Officers then
 arrested Pham.
 
 
          ¶6
 The Jefferson County District Attorney charged Pham with nine
 counts, including possession with intent to manufacture or
 distribute a controlled substance, possession of a weapon by
 a previous offender, and possession of drug paraphernalia.
 Pham moved to suppress the evidence seized as a result of the
 traffic stop, arguing, among other things, that the law
 enforcement officers had no basis to remove him from his
 vehicle and that the dog sniff of his vehicle was an
 unconstitutional search because it was conducted without
 probable cause.
 
 
          ¶7
 The trial court subsequently held a suppression hearing and
 concluded that the search was unconstitutional because the
 officers (1) had no reason to remove Pham from his vehicle
 and (2) acted improperly when they intentionally left the
 
 5
 
 vehicle door open so that the dog could sniff inside the
 vehicle. Specifically, the court found and concluded:
 
 
 [T]he issue here is that officers aren't looking in the
 car for evidence of an unsafe lane change. That happened, and
 the officer has a right to pull him over for that. Does he
 have the right then to ask Mr. Pham to get out of the car so
 he can do an open air search around the car?
 
 
 I haven't been given any law that says that's
 okay....
 
 
 [I]n this case, he said they took him out-unless I
 misheard-they said they took him out so they could search the
 car-or so they could do the open air sniff and they
 didn't want the dog to bite Mr. Pham. Also, then, we get
 to the point in the video it's pretty clear that the
 officer is the one holding the door open.
 
 
 They tell Mr. Pham to get out and come over here, and I
 don't know what the reason is, other than he's going
 to get a ticket, and then they don't shut the door. And
 it's a little bit disingenuous for Officer Winters to
 say, yeah, I asked him questions about the car and is it the
 same way as we left it, yeah, but who opened the door. And I
 don't know, in that video it's pretty clear that the
 officer-somebody opens the door. The officer puts his hand on
 the door and escorts Mr. Pham away and leaves the door open.
 
 
 I don't think that's okay....
 
 
 The-for me, the stop is fine. The ticket is fine. For me
 even-sure, even pulling him out of the car, if there's a
 reason-and I haven't heard one, so that's the first
 reason that I don't think this is a valid search. They
 don't have any reason to take him out .... ....
 
 
 And the second part is that they left the door open and the
 dog sniffed there.... [I]s it a valid open air sniff if he
 leaves the car door open on purpose, which it looks like they
 did. I don't know. I didn't hear anymore [sic] about
 that.
 
 6
 
 So I'm going to find, in fact, that I will suppress the
 search of the car because I don't find that they had a
 valid reason. The dog sniff would have been a good reason. It
 would have been probable cause to search the car, but, again,
 I don't have anything to support that they can take him
 out, take him out of the car to do a dog sniff, or if they
 can on purpose leave the door open so that they can sort of
 sniff what's inside.
 
 
 And the reason I'm making this ruling is because these
 people have-the police officers knew what they were doing....
 
 
 . . . I think the search is not authorized because they
 didn't have probable cause, even with the dog sniff, and
 that was because they left the door open.
 
 
          ¶8
 The People then filed this interlocutory appeal.
 
 
          II.
 Analysis
 
 
          ¶9
 We begin by addressing our jurisdiction over this matter.
 Next, we set forth the applicable standard of review. We then
 discuss the applicable law and apply that law to the facts
 before us.
 
 
          A.
 Jurisdiction
 
 
          ¶10
 Section 16-12-102(2), C.R.S. (2024), and C.A.R. 4.1(a)
 authorize the prosecution to file an interlocutory appeal in
 this court from a trial court's order granting a
 defendant's pretrial motion to suppress evidence if the
 prosecution certifies to both the judge who granted the
 motion and this court that the appeal is not taken for
 purposes of delay and the evidence at issue is a substantial
 part of the proof of the charge pending against the
 defendant. People v. Thompson, 2021 CO 15, ¶
 13, 500 P.3d 1075, 1078. The prosecution has so certified
 here, and Pham
 
 7
 
 has not challenged that certification. Accordingly, we have
 jurisdiction over the People's appeal in this case.
 
 
          B.
 Standard of Review
 
 
          ¶11
 A trial court's suppression order presents a mixed
 question of fact and law. Id. at ¶ 15, 500 P.3d
 at 1078. "We accept the trial court's findings of
 historic fact if those findings are supported by competent
 evidence, but we assess the legal significance of the facts
 de novo." Id. (quoting People v. Coke,
 2020 CO 28, ¶ 10, 461 P.3d 508, 512). Accordingly,
 "[w]e will not substitute our own judgment for that of
 the trial court unless the trial court's findings are
 clearly erroneous or not supported by the record."
 People v. Glick, 250 P.3d 578, 582 (Colo. 2011). We
 will, however, correct on review a trial court's
 application of an erroneous legal standard or the court's
 ultimate legal conclusion if that conclusion is inconsistent
 with or unsupported by evidentiary findings. People v.
 Kaiser, 32 P.3d 480, 483 (Colo. 2001).
 
 
          ¶12
 "In reviewing a trial court's ruling on a motion to
 suppress, we look solely to the record created at the
 suppression hearing." Thompson, ¶ 16, 500
 P.3d at 1078.
 
 
          C.
 Searches and Probable Cause
 
 
          ¶13
 The Fourth Amendment protects individuals against
 unreasonable searches and seizures. U.S. Const. amend. IV.
 The Fourth Amendment provides:
 
 
 The right of the people to be secure in their persons,
 houses, papers, and effects, against unreasonable searches
 and seizures, shall not be
 
 8
 
 violated, and no Warrants shall issue, but upon probable
 cause, supported by Oath or affirmation, and particularly
 describing the place to be searched, and the persons or
 things to be seized.
 
 
          ¶14
 "It is beyond dispute that a vehicle is an
 'effect' as that term is used in the Amendment."
 United States v. Jones, 565 U.S. 400, 404 (2012).
 
 
          ¶15
 In addition, a search occurs within the meaning of the Fourth
 Amendment when the government physically occupies private
 property, including a vehicle, in order to obtain
 information. Id. at 404-05.
 
 
          ¶16
 "In enforcing the Fourth Amendment's prohibition
 against unreasonable searches and seizures, the [Supreme]
 Court has insisted upon probable cause as a minimum
 requirement for a reasonable search permitted by the
 Constitution." Chambers v. Maroney, 399 U.S.
 42, 51 (1970). A law enforcement officer has probable cause
 to conduct a search when "the facts available to [him]
 would 'warrant a [person] of reasonable caution in the
 belief'" that contraband or evidence of a crime is
 present. Florida v. Harris, 568 U.S. 237, 243 (2013)
 (alterations in original) (quoting Texas v. Brown,
 460 U.S. 730, 742 (1983) (plurality opinion)).
 
 
          ¶17
 In determining whether probable cause exists, courts consider
 the totality of the circumstances. Id. at 243-44.
 Moreover, the Supreme Court has viewed probable cause as
 "a fluid concept-turning on the assessment of
 probabilities in particular factual contexts-not readily, or
 even usefully, reduced to a neat set of legal rules."
 Id. at 244 (quoting Illinois v. Gates, 462
 U.S. 213, 232 (1983)).
 
 9
 
          ¶18
 Turning to the specific issues now before us, we note that
 the Supreme Court has made clear that, out of concern for
 police officer safety, officers may, "consistent with
 the Fourth Amendment, exercise their discretion to require a
 driver who commits a traffic violation to exit the vehicle
 even though they lack any particularized reason for believing
 the driver possesses a weapon." New York v.
 Class, 475 U.S. 106, 115 (1986). In this regard, the
 Court has observed that requiring a driver to exit a vehicle
 is a "de minimis" additional intrusion
 and, at most, a "mere inconvenience" when balanced
 against legitimate concerns for officer safety.
 Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977).
 
 
          ¶19
 With respect to dog sniffs, the search of the interior of a
 home and its curtilage are indisputably subject to Fourth
 Amendment protection. See Florida v. Jardines, 569
 U.S. 1, 6 (2013). Accordingly, the Supreme Court has
 concluded that the government's use of a trained police
 dog to investigate a home and its immediate surroundings is a
 "search" under the Fourth Amendment. Id.
 at 11-12. ¶20 The search of a vehicle's interior is
 likewise subject to Fourth Amendment protection, and such a
 search must be supported by probable cause. Class,
 475 U.S. at 114-17. This case requires us to determine when a
 dog sniff of a vehicle's interior rises to the level of a
 search warranting Fourth Amendment protection.
 
 
          ¶21
 Both the Supreme Court and our court have concluded that a
 dog sniff around the exterior of a vehicle while a person is
 lawfully seized for a traffic
 
 10
 
 violation does not rise to the level of an infringement of
 the person's constitutional rights and thus does not
 implicate Fourth Amendment protections. Illinois v.
 Caballes, 543 U.S. 405, 409 (2005); People v.
 Mason, 2013 CO 32, ¶ 10, 310 P.3d 1003, 1005. The
 Tenth Circuit has concluded, however, that when, prior to
 establishing probable cause, law enforcement officers
 facilitate a dog's entry into a vehicle during a dog
 sniff, this implicates the Fourth Amendment. Felders v.
 Malcom, 755 F.3d 870, 879 (10th Cir. 2014).
 
 
          ¶22
 Specifically, in Felders, video footage showed that
 a state trooper had opened the passenger doors of a vehicle
 during an investigatory stop, removed the passengers, and
 intentionally left a door open, even physically preventing
 one of the passengers from closing that door. Id. at
 877. A K-9 unit officer then led a drug-sniffing dog around
 the vehicle, and the dog jumped into the vehicle through the
 open passenger door. Id. The sniff ultimately
 yielded no drugs, and Felders and her passengers brought a
 civil action, alleging that the law enforcement officers had
 searched Felders's car in violation of the Fourth
 Amendment. Id. at 875, 877.
 
 
          ¶23
 The Felders court ultimately determined that the
 officers did not have probable cause to conduct the dog sniff
 at issue. Id. at 879. Although the court observed
 that a dog sniff outside a car during a lawful traffic stop
 is not a search, the court noted that "officers cannot
 rely on a dog's alert to establish probable
 
 11
 
 cause if the officers open part of the vehicle so the dog may
 enter the vehicle or otherwise facilitate its entry."
 Id. at 880. The court thus concluded:
 
 
 [A] trained dog's alert from areas where the motorist has
 no legitimate expectation of privacy-the exterior of the car
 or the interior of the car that the motorist has voluntarily
 exposed to the dog-provides sufficient probable cause to
 search the interior. But where there is evidence that it is
 not the driver but the officers who have "create[d] the
 opportunity for a drug dog to go where the officer himself
 cannot go," the Fourth Amendment protects the
 driver's right to privacy to the interior compartment
 until the dog alerts from the exterior of the car.
 
 
 Id. (second alteration in original) (quoting
 United States v. Lyons, 486 F.3d 367, 373 (8th Cir.
 2007)).
 
 
          D.
 Application
 
 
          ¶24
 Applying the foregoing principles to the facts before us, we
 initially conclude that the trial court erred in finding that
 it was improper for the agents to remove Pham from his
 vehicle after properly initiating a traffic stop.
 
 
          ¶25
 As noted above, in Mimms, 434 U.S. at 111, the
 Supreme Court concluded that legitimate concerns for officer
 safety outweigh the de minimis intrusion into a
 driver's personal liberty occasioned by an officer's
 request that a lawfully stopped driver get out of the car.
 There, officers had pulled Mimms over for driving with an
 expired license plate, and one of the officers asked Mimms to
 exit the vehicle, apparently as a standard practice.
 Id. at 107, 109-10. Although the State conceded that
 the officer had no reason to suspect Mimms of foul play at
 that point in the
 
 12
 
 interaction, the Court nonetheless concluded that when a
 vehicle has been lawfully detained for a traffic violation,
 police officers may order the driver to exit the vehicle
 without violating the Fourth Amendment. Id. at 109,
 111 n.6.
 
 
          ¶26
 In our view, the same principle applies here. The agents had
 lawfully stopped Pham for a suspected lane change violation.
 Accordingly, under Mimms, the agents acted
 appropriately when they ordered Pham out of his vehicle, even
 though they had no particularized concern for their safety
 when they did so. See id. As a result, we conclude
 that the trial court erred in determining that the agents had
 acted unlawfully in ordering Pham out of his vehicle.
 
 
          ¶27
 The question thus becomes whether the agents conducted a
 search of Pham's vehicle when the drug-detection dog
 entered the vehicle to conduct a sniff. On the facts of this
 case, we conclude that they did, and because the search was
 not supported by probable cause, we further conclude that the
 search was unconstitutional.
 
 
          ¶28
 As discussed above, in Felders, 755 F.3d at 877, the
 Tenth Circuit concluded that when a police officer, without
 probable cause, facilitates a drug-detection dog's entry
 into a vehicle during a dog sniff, this constitutes an
 unconstitutional search. Indeed, the cases on which the
 People rely are in accord.
 
 
          ¶29
 Specifically, as the People contend, some federal courts have
 perceived no Fourth Amendment violation when a drug-detection
 dog acted "instinctively" and
 
 13
 
 without facilitation by its handler in entering a
 vehicle. See, e.g., United States v. Sharp,
 689 F.3d 616, 620 (6th Cir. 2012); United States v.
 Pierce, 622 F.3d 209, 214-15 (3d Cir. 2010).
 Accordingly, even the case law on which the People rely
 supports the conclusion that when a police officer, without
 probable cause, facilitates a drug-detection dog's entry
 into a vehicle during a dog sniff, it constitutes a search.
 See Sharp, 689 F.3d at 620; Pierce, 622
 F.3d at 214-15.
 
 
          ¶30
 Here, we need not confront the difficult question of whether
 and when a dog acts instinctively because the trial court
 found, with ample record support, that the police agents in
 this case facilitated the dog's entry into Pham's
 vehicle. Specifically, the record, including footage from
 Agent Winters's body-worn camera, shows that an agent
 ordered Pham out of the vehicle, putting his hand on the top
 of the door when Pham exited so that he could not have closed
 the door had he tried. The agents then immediately conducted
 a pat down of Pham and directed him away from the vehicle,
 leaving the door open. Once Pham was away from the vehicle,
 Agent Winters deployed the drug-detection dog, and when the
 dog got to the open driver's side door, Agent Winters
 partially closed the door to allow him and the dog to
 maneuver around it. Agent Winters then reopened the door
 sufficiently to allow the dog to place his head and front
 paws inside the vehicle, at which point the dog alerted to
 the presence of drugs.
 
 14
 
          ¶31
 On these facts, and in light of the above-described case law,
 we conclude that the law enforcement officers in this case
 conducted a search within the meaning of the Fourth Amendment
 when they facilitated the dog's entry into Pham's
 vehicle. This was not a scenario in which the officers merely
 left a door open so that the dog could get a better sniff of
 the ambient air. Rather, the record reflects, and the trial
 court properly found, that, through their own actions, the
 officers facilitated the dog's entry into
 Pham's vehicle so that the dog could sniff inside.
 (Notably, the dog did not alert when sniffing around the
 vehicle's closed doors; he alerted only after entering
 the vehicle.)
 
 
          ¶32
 The question remains whether this search was supported by
 probable cause. We conclude that it was not.
 
 
          ¶33
 As noted above, probable cause exists when the facts
 available to a police officer would warrant a person of
 reasonable caution to believe that contraband or evidence of
 a crime is present. Harris, 568 U.S. at 243. The
 record does not establish such a reasonable belief here.
 
 
          ¶34
 Law enforcement officers stopped Pham for a suspected lane
 change violation after he left an allegedly high-crime area.
 The officers had no indication that Pham had been involved in
 any criminal activity in that area. Nor does the record show
 that the officers were aware of any facts suggesting that
 there was contraband in Pham's vehicle (a lane change
 violation, in and of itself, does not
 
 15
 
 establish such a fact). And the dog did not alert until it
 entered Pham's vehicle (thus, any facts establishing
 probable cause arose after the search began).
 
 
          ¶35
 Accordingly, we conclude that the officers conducted the
 search at issue without the requisite probable cause.
 
 
          III.
 Conclusion
 
 
          ¶36
 For these reasons, we conclude that although the Lakewood
 police agents acted properly in removing Pham from his
 vehicle in the course of a lawful traffic stop, they
 conducted a search of that vehicle under the Fourth Amendment
 when they facilitated the drug-detection dog's sniff of
 the vehicle's interior. We further conclude that the
 agents conducted this search without probable cause, thereby
 violating Pham's Fourth Amendment rights.
 
 
          ¶37
 Accordingly, we affirm the trial court's order granting
 Pham's motion to suppress evidence discovered as a result
 of the unconstitutional search, and we remand this case to
 the trial court for further proceedings consistent with this
 opinion.
 
 
          
 JUSTICE BOATRIGHT, joined by CHIEF JUSTICE MARQUEZ,
 dissented.
 
 16
 
          
 JUSTICE BOATRIGHT, joined by CHIEF JUSTICE MARQUEZ,
 dissenting.
 
 
          ¶38
 In this case, the district court suppressed evidence because
 "the police officers knew what they were doing" by
 "on purpose leav[ing] the door open so that they can
 sort of sniff what's inside." I agree; the agents
 did know what they were doing. They were familiar with, and
 knowingly adhered to, the prevailing standards governing how
 to properly conduct a K-9 drug sniff when a vehicle's
 occupant leaves its doors or windows open, as Tien Dinh Pham
 did here.
 
 
          ¶39
 Today the majority concludes that evidence must be
 suppressed, not because of any specific unlawful police
 conduct, but rather, what the police did not do. The majority
 concludes that the police facilitated K-9 Duke's illegal
 entry into Pham's vehicle, largely because they failed to
 affirmatively close the door that Pham, himself, had left
 open. Maj. op. ¶¶ 30-31. Apparently, not closing
 the defendant's door amounts to unlawful conduct, as the
 "'prime purpose' of the exclusionary rule
 'is to deter future unlawful police conduct.'"
 Illinois v. Krull, 480 U.S. 340, 347 (1987) (quoting
 United States v. Calandra, 414 U.S. 338, 347
 (1974)).
 
 
          ¶40
 In this case, however, I do not perceive that any unlawful
 police conduct occurred. It is undisputed that the agents
 properly stopped Pham, and I agree with the majority that
 ordering him out of the vehicle was justified. However, there
 is no constitutional right requiring the police to close a
 vehicle's door after it has been left open by its
 occupant. Further, although I agree with the majority's
 
 17
 
 "facilitation" test, I disagree with its
 application and conclusion. Because Pham left his car door
 open, the agents' leaving it open did not
 "facilitate" Duke's entry and was lawful.
 Hence, I respectfully dissent.
 
 
          I.
 Pham Left the Door Open
 
 
          ¶41
 As the majority notes, "In reviewing a trial court's
 ruling on a motion to suppress, we look solely to the record
 created at the suppression hearing." Maj. op. ¶ 12
 (quoting People v. Thompson, 2021 CO 15, ¶ 16,
 500 P.3d 1075, 1078). However, body-worn camera footage is
 part of the record, and "we may independently review
 recordings including police bodycam footage." People
 v. Bohler, 2024 CO 18, ¶ 17, 545 P.3d 509, 514;
 see also People v. Platt, 81 P.3d 1060, 1067 (Colo.
 2004) ("When considering recorded statements . . . trial
 and appellate courts are in a similar review position."
 (citing People v. Al-Yousif, 49 P.3d 1165, 1171
 (Colo. 2002))). Accordingly, to elucidate the reasons for my
 dissent, I begin by reviewing the relevant facts from Agent
 Winters's body-worn camera footage and testimony,
 starting after the police lawfully stopped Pham's
 vehicle.
 
 
          ¶42
 When an agent ordered Pham out of the vehicle, Pham opened
 his door and exited. The agent stood nearby, briefly resting
 one hand on the doorframe. When Pham was outside, the same
 agent moved him to the side of the vehicle and performed a
 pat-down as another agent approached. Once the pat-down was
 complete, the agents directed Pham to wait nearby. At no
 point did Pham attempt
 
 18
 
 to close his door; nor did the agents do anything to prevent
 Pham from closing it. Instead, Pham walked away while looking
 at his phone.
 
 
          (Image
 Omitted)
 
 
          ¶43
 True, the police knew that an open car door would allow Duke
 to have a better whiff of the contents of Pham's car.
 They also knew that their opening the door could be
 problematic. Indeed, Agent Winters, who was Duke's
 handler, testified that based on his knowledge of the
 applicable legal standards, he closes doors or windows opened
 by the police before beginning a K-9 sniff.
 
 
 [M]y standard practice is to ask my officers how the vehicle
 . . . came to be in the position it was in. And if they
 inform me that [an officer] took some action to open a door,
 open a window, or anything like that, I will return it to a
 closed position. Essentially, I don't seek any unfair
 advantage in these sniffs.
 
 
          Body-worn
 camera footage confirms that the police followed this
 protocol here: an agent told Agent Winters that Pham left the
 door open. Agent Winters replied, "He did. Perfect,
 thank you," before proceeding.
 
 19
 
          ¶44
 Agent Winters then approached the vehicle with Duke. The pair
 started the open-air sniff on the passenger side, then
 proceeded around the front of the vehicle. As they neared the
 driver's side, Pham's open door was blocking their
 path, penned in by a cart in the adjoining parking space.
 Agent Winters closed the door partway; just enough for him
 and Duke to pass between the vehicle and the cart, then left
 the door in that partially closed position. The footage never
 shows Agent Winters shutting the door so completely that Duke
 could not have entered the vehicle. Nor does the footage show
 Agent Winters reopening the door to any significant degree,
 if at all.
 
 
          (Image
 Omitted)
 
 
          ¶45
 As Duke rounded the partially closed door, he apparently
 caught a scent emanating from the car, because he immediately
 went to the vehicle's open doorway. Agent Winters did not
 direct Duke to enter the vehicle. Nonetheless,
 
 20
 
 Duke placed his head and paws inside the car and sniffed, for
 a total of approximately three seconds, before alerting to
 the presence of contraband.
 
 
          (Image
 Omitted)
 
 
          The
 extent of Duke's entry. The door is partially closed, as
 Agent Winters left it.[1]
 
 
          ¶46
 Duke later alerted a second time, outside the driver's
 doorway and without entering the vehicle. Based on Duke's
 alerts, the agents determined that they had probable cause to
 search Pham's vehicle. That search revealed significant
 quantities of illegal narcotics, along with distribution
 paraphernalia and two handguns.
 
 
          II.
 The Agents' Conduct Was Lawful
 
 
          ¶47
 As noted above, the purpose of the exclusionary rule is to
 deter future unlawful police conduct. Krull, 480
 U.S. at 347. If there is no unlawful police
 
 21
 
 conduct, however, the exclusionary rule does not apply. In
 this case, the majority finds that the police facilitated
 Duke's entry when an agent briefly put his hand on
 Pham's door, then directed Pham away from the vehicle
 while leaving the door open. Maj. op. ¶¶ 30-31.
 Further, according to the majority, Agent Winters
 "reopened the door sufficiently to allow the dog to
 place his head and front paws inside the vehicle."
 Id. at ¶ 30. In doing so, the majority
 apparently leans into the district court's findings that
 "the police officers knew what they were doing";
 they "were after a little more than" an open-air
 sniff; and "the search [was] not authorized . . .
 because they left the door open." Id. at
 ¶¶ 7, 30-31.
 
 
          ¶48
 The majority and the district court seem to imply that the
 agents purposely took these actions, including leaving the
 door open, to make it easier for Duke to enter the
 vehicle. Id. at ¶¶ 30-31. Yet neither
 the district court nor the majority cite any evidence to
 support this position. In my view, the more accurate
 conclusion is that the agents knew they were not required to
 close the door and that leaving it open would give Duke a
 better chance of detecting any contraband in the vehicle.
 Leaving the door open, even if it was to give the dog a
 better sniff, does not violate the Constitution. Ample case
 law supports this position, as I describe below.
 
 22
 
          A.
 There Is No Constitutional Right to Closing a Car
 Door
 
 
          ¶49
 No constitutional right requires an agent to close a
 vehicle's door after it has been left open by its
 occupant. See United States v. Pulido-Ayala, 892
 F.3d 315, 319-20 (8th Cir. 2018) ("[T]he officers had no
 responsibility to close the door; they simply took the
 situation as they found it."); United States v.
 Lyons, 486 F.3d 367, 373 (8th Cir. 2007)
 ("Appellants do not cite to any authority that holds
 that the officers had the affirmative duty to close the
 windows in preparation for the dog sniff, and we find
 none."); compare United States v. Guidry, 817
 F.3d 997, 1006 (7th Cir. 2016) (affirming the denial of the
 defendant's motion to suppress and noting that the
 officers had no duty to close a vehicle's door when the
 defendant had left it open), with United States v.
 Winningham, 140 F.3d 1328, 1330-31 (10th Cir. 1998)
 (affirming suppression where "the officers themselves
 opened the door" then unleashed the drug dog, allowing
 it to enter the vehicle).
 
 
          ¶50
 Logic dictates that when a vehicle's doors or windows are
 left open, interior air can more easily escape. And a
 "dog sniff conducted during a concededly lawful traffic
 stop that reveals no information other than the location of a
 substance that no individual has any right to possess does
 not violate the Fourth Amendment." Illinois v.
 Caballes, 543 U.S. 405, 410 (2005). Accordingly, when a
 vehicle's occupant leaves its doors or windows open, I
 perceive no constitutional barrier to agents allowing them to
 remain open because they recognize it may help
 
 23
 
 a K-9 to better sniff any contraband inside. See
 Pulido-Ayala, 892 F.3d at 320 ("Insofar as the
 dog's ability to perceive the odor of drugs from outside
 the car was enhanced by the open door, the situation was
 created voluntarily by the passenger, and there was no
 unlawful search in leaving the door open."); see
 also Lyons, 486 F.3d at 373; Guidry, 817 F.3d
 at 1006; cf. Winningham, 140 F.3d at 1330-31.
 ¶51 In this case, the district court did not find that
 the agents prevented Pham from closing his door, only that
 they left it open. I am aware of no authority stating that
 because Agent Winters partially closed the door to get around
 the cart, he must then proceed to shut the door fully.
 Indeed, a comparison of the photos included above confirms
 Agent Winters's testimony that Pham left the door open,
 but that it was partially closed, by Agent Winters, at the
 time of Duke's entry.
 
 
          ¶52
 Because no constitutional right required the agents to
 affirmatively close Pham's door, leaving it open was
 permissible.
 
 
          B.
 The Agents Did Not Facilitate Duke's Entry;
 Felders Is Distinguishable
 
 
          ¶53
 Because the agents' choice to leave the door open did
 not, in itself, violate the Constitution, I now evaluate
 whether their actions improperly "facilitated"
 Duke's entry into Pham's vehicle. Felders v.
 Malcom, 755 F.3d 870, 880 (10th Cir. 2014). "[A]
 dog's instinctive jump into a car does not violate the
 Fourth Amendment ...." United States v. Sharp,
 689 F.3d 616, 619 (6th Cir. 2012).
 "'[I]nstinctive' implies the dog enters the car
 without assistance, facilitation, or
 
 24
 
 other intentional action by its handler." United
 States v. Pierce, 622 F.3d 209, 214 (3d Cir. 2010).
 
 
          ¶54
 The majority notes these standards, and reasons that,
 "[W]e need not confront the difficult question of
 whether and when a dog acts instinctively because the trial
 court found, with ample record support, that the police
 agents in this case facilitated the dog's entry into
 Pham's vehicle." Maj. op. ¶¶ 28-31.
 However, the district court did not find that the agents
 "facilitated" Duke's entry. In fact, the
 district court did not use the word "facilitate" at
 all. Instead, it found that the agents "didn't tell
 the dog to sniff there," and that "the behavior
 taken by the dog was on its own instinct." In other
 words, the district court found that Duke entered Pham's
 vehicle instinctively. Despite this finding, the majority
 concludes that the agents facilitated Duke's entry
 because an agent briefly placed his hand on Pham's door,
 agents left the door open, and Agent Winters partially
 closed, then supposedly reopened the door. Id. at
 ¶¶ 30-31. This conduct is clearly distinguishable
 from the case that the majority relies on: Felders.
 
 
          ¶55
 As the majority notes, "in Felders, video
 footage showed that a state trooper had opened the
 passenger doors of a vehicle . . . and intentionally
 left a door open, even physically preventing one of
 the passengers from closing that door." Id. at
 ¶ 22 (emphases added); see also Felders, 755
 F.3d at 877. Thus, in Felders, the potential
 "facilitation" was not merely police leaving the
 door open but opening the door in
 
 25
 
 the first place, then physically preventing the occupants
 from closing it.[2] Consequently, the test applied in
 Felders requires purposeful state action, not
 inaction.
 
 
          ¶56
 Moreover, the swath of cases cited in Felders lead
 to the same conclusion. For example, the Tenth Circuit
 compared Winningham, 140 F.3d at 1330-31, in which
 the court found a "desire to facilitate a dog
 sniff of the van's interior" where officers opened
 the van door and unleashed their K-9 prior to its entry, with
 United States v. Stone, 866 F.2d 359, 363-64 (10th
 Cir. 1989), where the court found no facilitation when a
 car's owner voluntarily opened the vehicle's rear
 hatch and there was no evidence that the police
 "encouraged the dog to jump in the car."
 Felders, 755 F.3d at 885. In Felders, the
 Tenth Circuit also referenced Sharp to further
 explain that the police must act during a K-9 sniff
 to constitute a Fourth Amendment violation:
 
 
 "It is a Fourth Amendment violation for a narcotics
 detection dog to jump into a car because of something the
 police did, like training the dog to jump into cars as
 part of the search or facilitating or encouraging the
 jump" but no violation occurs "as long as the
 canine enters the vehicle on its own initiative and is
 neither encouraged nor placed into the vehicle by law
 enforcement."
 
 26
 
 755 F.3d at 880 (emphasis added) (first quoting
 Sharp, 689 F.3d at 619-20; then citing
 Pierce, 622 F.3d at 213-15; and then citing
 Lyons, 486 F.3d at 373-74).
 
 
          ¶57
 In this case, the agents did not open the door. Nor did Pham
 attempt to close the door, and thus the agents did not
 physically prevent him from closing it. The agents neither
 unleashed Duke near the car door nor lifted him inside. They
 did not gesture, direct, or in any way encourage Duke to
 enter the vehicle. Further, Agent Winters testified that he
 has "never trained [Duke] to search the inside of
 vehicles." Because the agents had no duty to
 affirmatively close Pham's door, the fact that Agent
 Winters partially closed it to get around the cart is
 irrelevant. And although, after watching the body-worn camera
 footage, I disagree with the majority that Agent Winters
 reopened the door, the fact remains that even if he did, it
 did not facilitate Duke's entry because the door was
 never sufficiently closed to prevent Duke from entering in
 the first place.
 
 
          ¶58
 When viewed in the context of the cases cited above, these
 facts show that the agents did not do anything to
 facilitate Duke's entry. Further, the majority does not
 analogize to any cases in support of its conclusion that the
 agents' action in this case amounted to facilitation.
 Accordingly, I conclude that Felders, and the weight
 of authority, dictate that in this case the agents'
 conduct did not violate the Fourth Amendment.
 
 27
 
          III.
 Conclusion
 
 
          ¶59
 Today the majority finds that it was unlawful for agents to
 leave Pham's car door partially open. Or, in other words,
 it was unlawful for the agents to not close Pham's door.
 The result of the majority's decision appears to require
 police to affirmatively close a vehicle's doors or
 windows after they are left open by occupants before
 conducting a K-9 sniff; otherwise, they risk a finding that
 they facilitated the dog's entry. This standard is unlike
 any other I am aware of in the country. Furthermore, it
 raises significant questions about when other forms of police
 inaction may violate the Constitution.
 
 
          ¶60
 Because I perceive no unlawful police conduct in this case, I
 would not suppress the evidence found here. Hence, I
 respectfully dissent.
 
 
 ---------
 
 
 Notes:
 
 
 [1] The included photos show that the door
 was fully open when Pham exited, whereas it was partially
 shut when Duke entered. This supports Agent Winters's
 testimony that, "I had to shut the door slightly to
 allow Duke and myself to move past. Once we did, though, Duke
 began to examine the open driver's area
 ...."
 
 
 [2] In Felders, the Tenth Circuit
 did not conclude that there was facilitation because the case
 arose in the context of a motion for summary judgment. 755
 F.3d at 886. The Tenth Circuit affirmed the district
 court's denial of the motion because issues of material
 fact existed as to whether the officer's conduct violated
 the defendant's constitutional rights.
 Id.
 
 
 ---------